## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Petition of the UNITED STATES       )

                 )

        on behalf and for the    )
        benefit of              )

                 )

THE SMITHSONIAN INSTITUTION   )    Misc. Action No.
1000 Jefferson Drive, S.W.        )
Washington, DC  20560         )

                 )

        Donee.          )

                 )

## PETITION FOR MODIFICATION OF A RESTRICTED ENDOWMENT FUND AND RESTRICTED GIFT

The United States, on behalf and for the benefit of the Smithsonian Institution, brings this Petition seeking to modify certain terms of a restricted endowment fund and a restricted collection left to the Smithsonian by a charitable bequest contained in the Last Will and Testament of Dr. Carl J. Drake, a former professor at Iowa State College and an honorary research associate at the Smithsonian.  In support of the Petition, the United States alleges as follows:

1.  The Smithsonian Institution ("the Smithsonian") is an establishment in Washington, D.C. created by an act of Congress, see 20 U.S.C. §§ 41 et seq., "for the increase and diffusion of knowledge among men." Id. § 41.

2.  The main offices of the Smithsonian are at 1000 Jefferson Drive, S.W., Washington, D.C.

3.  The Smithsonian is governed by a Board of Regents composed of the Chief Justice, the Vice-President, three members of the Senate, three members of the House of Representatives, and

nine other persons not members of Congress. The Secretary of the Smithsonian is its executive
officer and director of its activities.

4. In furtherance of its statutory purpose, the Smithsonian expends both federally
appropriated funds and nonappropriated funds it generates or receives (which the Smithsonian
calls "trust" funds). Among its other powers, the Smithsonian may "receive money or other
property by gift, bequest, or devise, and . . . hold and dispose of the same in promotion of the
purposes thereof." Id. § 55. The Smithsonian has an endowment through which it holds and
manages gifts and bequests of funds, including restricted funds. Since the Smithsonian is a
qualified tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code of 1954,
such gifts are deductible as charitable contributions for federal income tax purposes.

5. In performing its functions, the Smithsonian carries out the trust obligations of the
United States, and its duties and obligations are defined by the laws of the United States.

## JURISDICTION AND VENUE

6. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C.
§ 1345. Venue properly lies in this Court under 28 U.S.C. § 1391.

## FACTS

### The National Museum of Natural History Department of Entomology

7. The National Museum of Natural History ("NMNH") is a Smithsonian museum located
on the National Mall in Washington, D.C. NMNH has a Department of Entomology.
Entomology is the scientific study of insects.

8. The collections of the Department of Entomology are a biological and historical
resource held for the benefit of all people. The collections are used for research by Smithsonian

2

employees as well as the United States Department of Agriculture, and are routinely studied by visiting researchers in both applied and academic branches of entomology. The Department of Entomology also regularly loans collections to qualified researchers in the United States and around the world.

Dr. Carl J. Drake

9. Dr. Carl J. Drake was a professor in the Department of Zoology and Entomology at Iowa State College. In early 1957, Dr. Drake moved to Washington and was appointed as an Honorary Research Associate of the Smithsonian, renewable at agreed-upon intervals.

10. Over the course of his career, Dr. Drake amassed a broad, scientifically significant private collection of Hemiptera-Heteroptera, the scientific name of an order of insects also known as true bugs.

11. The Hemiptera-Heteroptera collection at the Smithsonian Institution is one of the most scientifically valuable collections in the world in terms of its size and representation of species.

12. Dr. Drake was still working at the Smithsonian at the time of his death in 1965.

Dr. Drake's Will

13. Dr. Drake's Will was filed in the probate court in Washington, D.C. on November 5, 1965. See Exhibit 1 ("Last Will and Testament of Carl John Drake").

14. The Will had been signed by Dr. Drake and two witnesses on December 28, 1956 in Ames, Iowa.

15. In the Will, Dr. Drake bequeathed his entire Hemiptera-Heteroptera collection to the Smithsonian:

3

> on the condition, however, that the said collection shall be kept intact
> as a separate unit, and that the specimens therein shall not be loaned
> out or sold to other institutions or individuals. The entire collection,
> however, shall be available for scientific study by institutions or
> individuals accredited for that purpose by the Smithsonian
> Institute.

Id. (Paragraph SECOND). Dr. Drake also left his scientific library to the Smithsonian, but said

that "[s]eparates and other papers in Hemiptera shall be kept with the collection." Id. (Paragraph

FOURTH).

16. In the Will, Dr. Drake also made a monetary bequest of $15,000 to his nephew, Ralph

Drake (or Ralph's wife, Mayo Drake). In addition, Dr. Drake left $5,000 to Kay Ann Drake, the

daughter of Ralph and Mayo Drake. See id. (Paragraph THIRD). The Will also gave Ralph or

Mayo Drake the option to keep items of Dr. Drake's personal property if they chose to do so. See

id. No other relatives are mentioned in Dr. Drake's Will. See id.

17. On information and belief, Ralph and Mayo Drake are both deceased. On information

and belief, Kay Ann Drake is living and resides in Tiffin, Ohio or Bellevue, Ohio.

18. The remainder of Dr. Drake's estate was bequeathed to the Smithsonian, to be placed

in a trust fund known as the Drake Foundation. See id. (Paragraph FIFTH).

19. According to Dr. Drake's Will, the "Directors" of the Smithsonian are to have full

control of the management and investment of the funds. Id. The income from the funds is to be

used for the purchase of specimens and collections of Hemiptera-Heteroptera to be added to Dr.

Drake's collection. Id. During the first 10 years, 50% of the income was to be used for this

purpose and the balance added to the principal. After the first ten years, 75% of the income is to

be used and the balance added to the principal. Id. The Will does not provide for a reversion

under any circumstances. See id.

4

20.  In addition to his Will, Dr. Drake signed an "Agreement" in Ames, Iowa on December 18, 1956.  See Exhibit 2.  The Agreement provided, in relevant part, that Dr. Drake's Hemiptera-Heteroptera collection would "be presented to the Smithsonian Institution as a permanent deposit" and that "unrestricted title will vest in the Smithsonian Institution on his (Dr. Carl J. Drake) death, subject to such provisions concerning use and further development of said collection as are provided in Dr. Drake's will, the provisions of this will being fully known to both parties."  Id.

21.  An unsigned copy of the Agreement was filed with Dr. Drake's Will in probate court. See Ex. 1.

22.  The Smithsonian accepted all legacies as specified in Dr. Drake's Will.  See Exhibit 3 (March 23, 1967 Letter from Peter G. Powers, General Counsel to the Smithsonian, to Joseph Clancy, the attorney for the Drake Estate).  The Smithsonian has since acted and is still acting to manage the Drake Foundation fund and Dr. Drake's collection of Hemiptera-Heteroptera under the terms of Dr. Drake's Will.

23.  Dr. Drake's collection of Hemiptera-Heteroptera is located in Washington, D.C., and has been maintained in the District of Columbia since Dr. Drake's death.

The Smithsonian's Use of the Drake Collection and the Drake Foundation Funds

24.  The terms of Dr. Drake's Will currently require the Smithsonian to spend 75% of the income from the fund each year to purchase specimens and collections of Hemiptera-Heteroptera to be added to Dr. Drake's collection.  See Ex. 1 (Paragraph FIFTH).  The Smithsonian Board of Regents establishes the payout annually from the Smithsonian's endowment.  The historic payout policy has been to pay (over the long term) 5.0% of the average market value over the prior five

5

years (although for the Drake Foundation the payout is 75% of this amount because of the requirement in Dr. Drake's Will that 25% of the income be added to principal and reinvested). In recent years, the Smithsonian has been unable to spend most of the annual payout from the Drake Foundation fund because the payout from the fund greatly exceeds the amount that can practically be spent on purchases of Hemiptera-Heteroptera. For most years over the life of the fund, the majority of the payout has been reinvested in the endowment.

25. Scientifically significant collections of Hemiptera-Heteroptera rarely come up for sale. In recent years, the number of private collections has decreased further because regulatory and permitting requirements related to collecting have increased, both in the United States and abroad. The Department of Entomology has been able to use Drake Foundation funds to purchase a significant Hemiptera-Heteroptera collection approximately twelve times in the last forty-plus years. The Department of Entomology purchased a smaller collection in two parts in 2009 and 2012; however, the last significant collection was purchased in 2002.

26. The Smithsonian has also interpreted the term "purchase" in Dr. Drake's Will to include acquisition of insects through field collection. On information and belief, most of the Drake Foundation funds that have been spent over the years have been spent on field collecting. This was particularly true during the period from 1994-2005.

27. The Department of Entomology has not engaged in the same level of field collecting of Hemiptera-Heteroptera since 2005, and does not anticipate doing so in the future. Fieldwork is also becoming increasingly difficult due to the same regulatory and permitting hurdles that have hindered private collecting.

28. The amounts expended from the Drake Foundation fund have declined substantially since 2005. In Fiscal Year 2006 (which included carry-over payments in support of field collecting), the Department of Entomology spent approximately half of the payout. Since then, the Department has spent between approximately 9% and 21% of the payout each year. It is likely that the spending pattern in Fiscal Years 2007-2012 will approximate the typical spending pattern over the life of the fund (except for the period of heightened field collecting).

29. The annual payout from the Fund is substantial. For example, in Fiscal Year 2013, the payout was $139,406.69. The Entomology Department approved proposals to use $17,370 of this amount.

30. Over the next decade, the Department of Entomology anticipates spending a maximum of approximately $30,000 per year, or approximately 25% of the annual payout. The rest of the payout will be reinvested in the endowment, further increasing the endowment and the payout itself.

31. The Fund was valued at approximately $250,000 in January 1969. As of September 30, 2013, the market value of the Drake Foundation fund endowment was $3,936,330.69.

32. Due to the accumulation of the endowment and developments in modern museum practice, the Smithsonian would like to use Dr. Drake's collection of Hemiptera-Heteroptera and the Drake Foundation funds for purposes beyond the literal terms of Dr. Drake's Will, but consistent with Dr. Drake's purpose in bequeathing these gifts to the Smithsonian.

Proposed Modifications

33. NMNH would like to use the annual payout from the Drake Foundation fund for three purposes in addition to the purchasing of Hemiptera-Heteroptera collections to add to the Drake

7

Collection. They are: (1) To support scientific research by employees (including a possible endowed position), graduate students, post-doctorate students, and visiting scientific experts on NMNH's Hemiptera-Heteroptera collection and to support those persons in curating and improving the quality of the collection; (2) To support Hemiptera-Heteroptera technicians to prepare (e.g., mount and label) specimens and help with other efforts related to NMNH's Hemiptera-Heteroptera collection, including maintaining the collection, entering collections information into NMNH's collections database, and imaging specimens to create digital photographic records; and (3) To purchase cabinets, drawers, and other standard entomological museum supplies needed to house and preserve NMNH's Hemiptera-Heteroptera collection. Improving the quality of the collection would involve technical work such as labeling cabinets, trays, and drawers, as well as scientific work such as identifying a specimen's family, genus, and species. The duties of an endowed position would also relate to NMNH's Hemiptera-Heteroptera collection as a whole, including outreach and supervising the work of others.

34. NMNH would like to use the funds for the benefit of the Smithsonian's entire Hemiptera-Heteroptera collection, not just the Drake Collection. The Drake Collection currently comprises approximately 30% of the Smithsonian's Hemiptera-Heteroptera collection. It would be difficult to expend all of the annual payout from the Drake Foundation fund improving only the specimens in the Drake Collection in the ways described in paragraph 33, above (as opposed to NMNH's larger collection).

35. NMNH would also like to modify certain restrictions in Dr. Drake's Will regarding the permissible uses of the Collection itself. NMNH would like to integrate the specimens from the Drake Collection with the Museum's Hemiptera-Heteroptera collection and to loan specimens

8

in the Drake Collection to qualified researchers consistent with Smithsonian and NMNH collection management policies. NMNH would continue to identify Drake's specimens as coming from the Drake Collection.

36. It has become impracticable, impossible and/or wasteful to strictly apply the terms of Dr. Drake's Will that bequeathed his collection of Hemiptera-Heteroptera to the Smithsonian and created the Drake Foundation fund. This is at least partly due to circumstances not anticipated by Dr. Drake.

37. The modifications that the Smithsonian wishes to implement would be consistent with Dr. Drake's intentions in bequeathing the Drake Collection and the Drake Foundation funds to the Smithsonian. These modifications would also better effectuate the broader purposes articulated in Dr. Drake's Will. See Ex. 1 (PARAGRAPH SECOND) (stating that collection was to be made "available for scientific study by institutions or individuals accredited for that purpose by the Smithsonian Institute").

38. Specifically, it has become impossible and wasteful to use the annual payout from the Drake Foundation fund to purchase specimens and collections of Hemiptera-Heteroptera. Dr. Drake likely could not have anticipated that it would become difficult for the Smithsonian to use a substantial amount of the annual payout from the Fund to purchase new Hemiptera-Heteroptera specimens or collections. Dr. Drake also likely did not anticipate how large the endowment would grow.

39. Modifying the terms of Dr. Drake's Will to permit the Smithsonian to use any left-over funds from the annual payout to support scientific research of Hemiptera-Heteroptera, as

9

well as to preserve and maintain NMNH's Hemiptera-Heteroptera collection, would further the purposes of Dr. Drake's gift. See Ex. 1 (Paragraph SECOND).

40. Because the entirety of the yearly payout from the Drake Foundation fund cannot be spent solely for improvements to his Collection, let alone the purchase of specimens to add to Dr. Drake's Collection, it is logical to conclude that Dr. Drake would have wanted any left-over funds from the annual payout to be used to benefit the Smithsonian's larger collection of Hemiptera-Heteroptera.

41. The conditions in Dr. Drake's Will that the Drake Collection "be kept intact as a separate unit" and that the specimens not be loaned out to other institutions or individuals have proven impracticable and wasteful. Moreover, these restrictions are now inconsistent with both Smithsonian and NMNH collection management policies, as well as modern museum practice.

42. The restriction in Dr. Drake's Will that the Drake Collection be kept separate from NMNH's Hemiptera-Heteroptera collection has become impracticable and wasteful. It is best museum practice to have specimens arranged by taxonomic group (e.g., family, genus, species). In the case of the Drake Collection, specimens are arranged separately from those of the same taxon in the larger Hemiptera-Heteroptera collection. This is impracticable because having specimens stored in two separate places makes it more difficult for visiting researchers to study them. It also takes more time for NMNH to maintain the Drake Collection and image specimens from the Drake Collection to create digital records of them because the Drake Collection is stored separately. Finally, storing the Collection separately taxes increasingly scarce collection space.

43. Dr. Drake likely did not anticipate that maintaining his collection of Hemiptera-Heteroptera separate from the NMNH's larger collection would make it more difficult for the

Smithsonian to improve upon and further the study of Hemiptera-Heteroptera. The integration of the Drake Collection into NMNH's larger collection of Hemiptera-Heteroptera would further the purposes of Drake's Will by making it easier for NMNH to preserve and improve the Drake Collection and NMNH's collection of Hemiptera-Heteroptera. It would also make it easier for researchers to study the Drake Collection, and NMNH's Hemiptera-Heteroptera resources in general.

44. The provision in Dr. Drake's Will requiring that specimens from the Drake Collection not be loaned out to others has also become impracticable because it impedes the ability of researchers and scholars to access the Drake Collection and prevents NMNH from fulfilling its core mission to increase and diffuse knowledge.

45. Modifying the terms of Dr. Drake's Will to allow for the loaning out of specimens would not be inconsistent with Dr. Drake's intentions in leaving the Drake Collection to the Smithsonian. Developments in modern lending practices have rendered the concerns that motivated Dr. Drake to include this restriction in his Will obsolete. Dr. Drake likely could not have anticipated that the development of modern museum lending practices would make the lending out of specimens more secure.

46. Permitting the loaning out of specimens would improve access to the Drake Collection by researchers and scholars, furthering one of the express purposes in Dr. Drake's Will and enhancing the overall value of the Drake Collection. See Ex. 1 (Paragraph SECOND).

## COUNT ONE: EQUITABLE DEVIATION

47. Petitioner repeats the allegations in paragraphs 1-46.

11

48. The provisions in Dr. Drake's Will establishing the Drake Foundation fund created a restricted endowment fund.  The provisions in Drakes' Will bequeathing the Drake Collection created a restricted collection.

49. This Court's general equity powers give it the authority to modify the restrictions in Dr. Drake's Will.

50. The doctrine of equitable deviation permits a court to modify restrictions if, because of circumstances not anticipated by the donor, modification will further the donor's purposes in making the restricted gift.

51. Dr. Drake did not anticipate the circumstances that have led the Smithsonian to request the modifications to his Will set forth in paragraphs 33-35, above.

52. The modifications set forth in paragraphs 33-35 would further the purposes of Dr. Drake's Will bequeathing the Drake Collection to the Smithsonian and establishing the Drake Foundation fund.

53. This Court should modify the terms of Paragraphs SECOND and FIFTH of Dr. Drake's Will, which is attached as Exhibit 1 to this Petition, as set forth in paragraphs 33-35 of this Petition, pursuant to the doctrine of equitable deviation.

## COUNT TWO:  *CY PRES*

54. Petitioner repeats the allegations in paragraphs 1-53.

55. The provisions in Dr. Drake's Will establishing the Drake Foundation fund created a restricted endowment fund.  The provisions in Drakes' Will bequeathing the Drake Collection created a restricted collection.

12

56. This Court's general equity powers give it the authority to modify the restrictions in Dr. Drake's Will.

57. Under the equitable doctrine of *cy pres*, if a particular charitable purpose is or becomes unlawful, impracticable, impossible to achieve, or wasteful, a court may apply *cy pres* to modify restrictions by directing that the restricted property be applied, in whole or in part, in a manner consistent with the donor's charitable purposes.

58. It has become impracticable, impossible and/or wasteful to strictly apply the terms of Dr. Drake's Will that bequeathed his collection of Hemiptera-Heteroptera to the Smithsonian and established the Drake Foundation fund.

59. Applying the modifications set forth in paragraphs 33-35 to the Drake Collection and Drake Foundation fund would be consistent with the charitable purposes of Dr. Drake's Will.

60. This Court should modify the terms of Paragraphs SECOND and FIFTH of Dr. Drake's Will, which is attached as Exhibit 1 to this Petition, as set forth in paragraphs 33-35 of this Petition, pursuant to the equitable doctrine of *cy pres*.

### INTERESTED PERSONS

61. The names and addresses of all persons who may be interested in these proceedings are as follows:

> The Honorable Eric Holder
> Attorney General of the United States
> 950 Pennsylvania Ave., NW
> Washington, D.C. 20530
> (as *parens patriae* of the public beneficiaries of this charitable gift)

> Kay Ann Dewitt (Drake)
> Tiffin, Ohio or Bellevue, Ohio
> (Great niece of Dr. Carl J. Drake)

13

A copy of this Petition will be sent to Ms. Dewitt via first class mail at her last-known addresses

62. There are no other persons known to Petitioner, other than those named above, who might have any interest in this proceeding.

## RELIEF REQUESTED

WHEREFORE, Petitioner prays that an order be entered construing the Will of Dr. Carl J. Drake to permit the following modifications under the doctrine(s) of equitable deviation and/or *cy pres*:

(1) The National Museum of National History is permitted to use the annual payout from the Drake Foundation fund to (a) support scientific research by employees (including a possible endowed position), graduate students, post-doctorate students, and visiting scientific experts on NMNH's Hemiptera-Heteroptera collection and to support those persons in curating and improving the quality of the collection; (b) support Hemiptera-Heteroptera technicians to prepare (e.g., mount and label) specimens and help with other efforts related to NMNH's Hemiptera-Heteroptera collection, including maintaining the collection, entering collections information into NMNH's collections database, and imaging specimens to create digital photographic records; and (c) purchase cabinets, drawers, and other standard entomological museum supplies needed to house and preserve NMNH's Hemiptera-Heteroptera collection. The duties of any endowed position must relate to NMNH's Hemiptera-Heteroptera collection. The annual payout may be used for the benefit of the Smithsonian's entire Hemiptera-Heteroptera collection, not just the Drake Collection;

(2) The National Museum of Natural History is permitted to integrate the specimens from the Drake Collection into the Museum's Hemiptera-Heteroptera collection. The Museum must

14

continue to identify any specimen from the Drake Collection as coming from the Drake Collection; and

(3) The National Museum of Natural History is permitted to loan specimens in the Drake Collection to qualified researchers consistent with Smithsonian and National Museum of Natural History collection management policies.

DATED this 30th day of December, 2013.          Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney

ARTHUR R. GOLDBERG
Assistant Branch Director
Civil Division, Federal Programs Branch

Jennie L. Kneedler
D.C. Bar No. 500261
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 305-8662
Fax: (202) 616-8470
Jennie.L.Kneedler@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C. 20044

Courier Address:
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

*Attorneys for the United States*