**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PETITION OF THE<br>UNITED STATES,<br><br>        on behalf of and for the<br>        benefit of<br><br>THE SMITHSONIAN INSTITUTION,<br><br>        Donee. | Civil Action No. 13-mc-1454 (KBJ) |

**MEMORANDUM OPINION ADOPTING**
**REPORT & RECOMMENDATION OF THE MAGISTRATE JUDGE**

On December 30, 2013, the United States, acting on behalf of the Smithsonian

Institution ("the Smithsonian"), filed a petition in this Court to modify restrictions on a

charitable gift that Dr. Carl J. Drake gave the Smithsonian in 1965.  (*See* Pet. for

Modification of a Restricted Endowment Fund and Restricted Gift ("Pet."), ECF No. 1,

at 1, 3.)[1]  Dr. Drake was a former professor of Zoology and Entomology at Iowa State

College who bequeathed a sizable and valuable collection of insect specimens to the

Smithsonian (the "Drake Collection"), as well as almost all of his financial estate (*see*

*id*. at ¶¶ 9–12, 15, 16, 18); the latter was placed in a trust fund known as "the Drake

Foundation" (*see id.* ¶ 18).  In its petition, the United States invokes the trust law

doctrines of equitable deviation and *cy pres*, and requests modification of three existing

restrictions on the Drake Collection and Drake Foundation: (1) the requirement that the

museum use Drake Foundation funds only to acquire additional specimens of the

---

[1] Page numbers herein refer to those that the Court's electronic case filing system automatically assigns.

suborder of insect known as Hemiptera-Heteroptera; (2) the requirement that the Smithsonian keep the Drake Collection separate and apart from other Hemiptera-Heteroptera specimens housed at the Smithsonian; and (3) the requirement that the Smithsonian not loan out Hemiptera-Heteroptera specimens from the Drake Collection. (*See* Pet. ¶¶ 33–46; *see also id.* ¶¶ 15, 19 (laying out restrictions).)[2]

Before this Court at present is the United States' petition and its motion for summary judgment concerning its request to modify the restrictions on Dr. Drake's bequest.  (*See* Pet; Mot. for Summ. J., ECF No. 3; *see also* Mot. to Supp. Summ. J. Record, ECF No. 5.)  On July 17, 2018, this Court referred this matter to a Magistrate Judge for full case management, and the Clerk's Office randomly assigned the case to Magistrate Judge G. Michael Harvey.  (*See* Min. Order of July 17, 2018; Min. Entry of July 17, 2018.)  On July 10, 2019, Magistrate Judge Harvey issued a 42-page Report and Recommendation ("R&R") that recommends that this Court grant the United States' petition and motion for summary judgment, in part.  (*See* R&R, ECF No. 9.)[3]

In the R&R, Magistrate Judge Harvey thoughtfully and extensively reviews the United States' request to modify certain restrictions governing the Smithsonian's use of the Drake Collection and Drake Foundation funds and carefully considers whether or not this Court should grant the petition.  (*See generally* R&R.)  In particular, the R&R first addresses three threshold issues: the source of the Court's jurisdiction over a case that "involves determining the extent of the Smithsonian's obligation to comply with

---

[2] These restrictions, which pertain to the particular order of insect species that Dr. Drake was conveying to the Smithsonian, were specified in Dr. Drake's will. (*See id.* ¶ 15.) According to the petition, "Hemiptera-Heteroptera" is "the scientific name of an order of insects also known as true bugs." (*Id.* ¶ 10.)

[3] The Report and Recommendation is attached hereto as Appendix A.

the conditions of Dr. Drake's will" (*id*. at 17); the applicability of the Uniform Trust

Code and District of Columbia trust law (*see id*. at 19–21); and the appropriateness of

the United States' request to proceed *ex parte* (*see id*. at 21–25).  Magistrate Judge

Harvey rightly concludes that, because the Smithsonian seeks to proceed under section

55 of Title 20 of the United States Code, *see* 20 U.S.C. § 55 (provision of the

Smithsonian charter authorizing the acceptance of money and other property by gift or

bequest), the Court has federal question jurisdiction under section 1331 of Title 28 of

the United States Code (*see id*. at 17), and that this matter constitutes a justiciable case

or controversy "because the United States seeks to do something it is currently barred

from doing" (*id*. at 18).  The R&R also correctly determines that the Uniform Trust

Code is applicable; that Dr. Drake's will should be interpreted according to D.C. trust

law; and that it is appropriate for the United States to proceed with its petition *ex parte*.

(*See id*. at 19–25.)

Magistrate Judge Harvey next considers the merits of the United States' petition.

The R&R finds that regulatory changes and institutional challenges have rendered

impracticable the condition that the Smithsonian use the Drake Foundation funds only

to purchase Hemiptera-Heteroptera.  (*See id*. at 30–31.)  Therefore, it recommends

applying *cy pres* to modify the conditions on the Smithsonian's use of funds from the

Drake Foundation.  (*See id*. at 28–31.)  Turning to the United States' proposals for

alternate uses of Drake Foundation Funds, the R&R then recommends that this Court

allow the funds to be used to support scientific research into the Hemiptera-Hoptera and

to maintain the entire Smithsonian Hemiptera-Hopetera collection.  (*See id*. at 31–36.)

However, Magistrate Judge Harvey concludes that a modification that permits Drake

Foundation funds to be used "'to purchase cabinets, drawers, and other standard entomological museum supplies,'" as the petition requests, is too far removed from Dr. Drake's intended use of the money from his estate.  (*Id.* at 36 (quoting Pet. at 3).)

Regarding the specimens of the Drake Collection, the R&R finds that "modifying the requirement to maintain the Drake Collection separate from the rest of the Smithsonian's Hemiptera-Heteroptera [collection] is warranted because the requirement is wasteful[,]" given the museum's limited storage space and modern museum practice. (*Id.* at 38–39.)  But the R&R recommends denying the United States' request to allow the Smithsonian to loan out specimens from the Drake Collection, because the United States "has not introduced any evidence" that this restriction "is impossible, impracticable, or wasteful."  (*Id.* at 40.)

Finally, Magistrate Judge Harvey's R&R specifically alerts the United States of the requirement that any objections to his findings and conclusions must be filed in writing within 14 days.  (*See id.* at 42.)  The R&R further informs the United States that any objections "must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections."  (*Id.*) It also advises "that failure to file timely objections to the findings and recommendations set forth in this report may waive [the] right of appeal from an order of the District Court that adopts such findings and recommendation."  (*Id.*)

After Magistrate Judge Harvey issued the R&R summarized above, the United States filed a notice that it did not object to Magistrate Judge Harvey's conclusions, but requested that this Court deny its request to permit the Smithsonian to lend out specimens from the Drake Collection *without prejudice*.  (*See* Notice of No Objection to

the Mag. J.'s Proposed Findings & Recommendations, ECF No. 10, at 1.)  This Court concludes that Magistrate Judge Harvey has thoroughly considered the issues raised in this action and has made reasonable findings and recommendations that comport with the evidence presented, and the Court will grant the United States' request.

Consequently, and especially in light of the fact that the United States does not object to the R&R's recommendations, this Court will **ADOPT** the attached R&R's findings and conclusions in full.  The Court will also **GRANT IN PART and DENY IN PART** the United States' motion for summary judgment.  The motion will be granted insofar as the Smithsonian will be permitted to use funds from the Drake Foundation to support scientific research into Hemiptera-Heteroptera and to curate and maintain the Smithsonian's entire Hemiptera-Heteroptera collection.  The  Smithsonian will also be permitted to integrate the Drake Collection into its other collection of Hemiptera-Heteroptera specimens, rather than keeping the Drake Collection separate.  The summary judgment motion is denied insofar as the Smithsonian will not be permitted to use Drake Foundation funds to purchase cabinets, drawers, and other supplies to house the Smithsonian's Hemiptera-Heteroptera collection, nor will the Smithsonian be allowed to lend out specimens from the Drake Collection.  The Court's denial of the Smithsonian's petition with respect to loans of Drake Collection specimens is without prejudice.

A separate Order consistent with this Memorandum Opinion will follow.


DATE: July 31, 2019                              *Ketanji Brown Jackson*
                                                 KETANJI BROWN JACKSON
                                                 United States District Judge

APPENDIX A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Petition of the UNITED STATES** <br><br> **on behalf of and for the benefit of** <br><br> **THE SMITHSONIAN INSTITUTION,** <br><br> **Donee.** | **Civil Action No.** <br> **1:13-mc-1454 (KBJ/GMH)** |

## <u>REPORT AND RECOMMENDATION</u>

This case is about death, bugs, and trust law. Specifically, at his death in 1965, renowned entomologist Dr. Carl J. Drake gave to the Smithsonian Institution ("the Smithsonian") his extensive collection of Hemiptera-Heteroptera, a suborder of insects known as "true bugs." Dr. Drake also gave to the Smithsonian the residue of his estate, which was valued at approximately $250,000 in the 1960s and is now worth more than $4 million. Dr. Drake's will included a number of restrictions. It required the Smithsonian to maintain the specimens in Dr. Drake's collection apart from its other Hemiptera-Heteroptera holdings and not to loan them out. It also required the Smithsonian to spend funds from Dr. Drake's residuary gift only on acquiring additional Hemiptera-Heteroptera specimens. Because it believes complying with these restrictions is now impracticable or wasteful, the United States has filed a petition on behalf of the Smithsonian seeking relief from them under the trust law doctrines of *cy pres* and equitable deviation.

This case was referred to the undersigned for a Report and Recommendation. Pending before the Court are (1) the petition for modification of a restricted endowment fund and restricted

gift and (2) a motion for summary judgment.  After reviewing the entire record,[1] the undersigned recommends that the Court grant in part and deny in part the United States' motions.

## I.     BACKGROUND

### A.     Hemiptera-Heteroptera, the Smithsonian, and Dr. Drake's Will

Hemiptera-Heteroptera is the scientific name for a suborder of insects also known as "true bugs."  ECF No. 5-1 at 2.  The suborder includes all manner of bugs including cicadas, plant bugs, water bugs, stink bugs, and bed bugs.[2]  The fossil record and genetic testing suggest Hemiptera-Heteroptera emerged on this planet over 200 million years ago, sometime in the Triassic period.[3]  These creatures have persisted across millennia over a period that included several mass-extinction events on Earth.[4]  At least for Hemiptera-Heteroptera, it is true that "life finds a way."[5]

In 1846, little more than 170 years ago—a flash in ecological terms—Congress established the Smithsonian "for the increase and diffusion of knowledge among men."  20 U.S.C. § 41.  Congress directed that the Smithsonian would serve as the federal government's central repository for "all objects of art and of foreign and curious research, and all objects of natural history, plants, and

---

[1] The relevant docket entries for the purposes of this Report and Recommendation are: (1) the Petition for Modification of a Restricted Endowment Fund and Restricted Gift (ECF No. 1); (2) the Motion for Summary Judgment (ECF No. 3); (3) a Notice of Supplemental Declaration (ECF No. 4); (4) a Motion to Supplement the Record and for Ruling on Motion for Summary Judgment (ECF No. 5); (5) a Transcript of a Motion Hearing (ECF No. 7); and (6) a Notice to Supplement the Record (ECF No. 8).  Citations to page numbers herein reflect the pagination assigned by the Court's Electronic Case Filing system.

[2] *See True Bugs*, Smithsonian Institution, https://www.si.edu/spotlight/buginfo/true-bugs (last visited July 9, 2019).

[3] *See, e.g.*, Li M, , et al, *Higher Level Phylogeny and the First Divergence Time Estimation of Heteroptera (Insecta: Hemiptera) Based on Multiple Genes*, 7:2 PLoS ONE at e32152 (2012), *available at*: https://doi.org/10.1371/journal.pone.0032152.  For comparison, recent evidence suggests our own species, *Homo sapiens*, evolved a mere 300,000–500,000 years ago.  *See, e.g.*, Chris Stringer & Julia Galway-Witham, *On the origin or our species*, 546 Nature 212–14 (June 8, 2017) (reviewing recent fossil and DNA discoveries).

[4] *See, e.g.*, L.H. Tanner, *et al*, *Assessing the record and causes of Late Triassic extinctions*, 65 Earth-Science Rev. 103, 103–04 (2004) (describing the late Triassic extinction as among the "big five" extinction events in Earth's history).

[5] Michael Crichton, *Jurassic Park* 178–79 (Ballantine Books Ed. 2015).

geological and mineralogical specimens belonging to the United States." 20 U.S.C. § 50. Congress authorized the Board of Regents of the Smithsonian to obtain new "specimens in natural history, geology, or mineralogy" either by purchase or by donation. *Id.* Congress also authorized the Smithsonian to "receive money [and] other property by gift, bequest, or devise" so long as it uses these non-appropriated funds in a manner "best suited for the promotion of the purpose of the testator." 20 U.S.C. §§ 55, 56.

Not quite three decades after the establishment of the Smithsonian, in 1883, Carl J. Drake was born in Seneca County, Ohio. ECF No. 2-1 at 2. As a young man, Carl Drake studied at Heidelberg College for two years before graduating from Baldwin-Wallace College in Berea, Ohio. *Id.* He completed a master's degree at the Ohio State University and attained his Ph.D. from Syracuse University. *Id.* A professor of zoology and entomology, Dr. Drake taught at Syracuse for four years before moving to Ames, Iowa, where he taught at Iowa State University for twenty more. *Id.* Over the course of his academic career, Dr. Drake became world-renowned as an entomologist. *Id.* Dr. Drake traveled the world in service of his entomological research, and, after retiring from active teaching, he spent the last twenty or so years of his life working with the Smithsonian. *Id.* An avid collector of Hemiptera-Heteroptera specimens, Dr. Drake obtained over the course of his life an extensive private collection of that suborder of insects. ECF No. 3-2 at 2.

In December 1956, when he was 73 years old, Dr. Drake signed a document titled "Agreement" and drafted and signed his will in Ames, Iowa. ECF No. 1-1 at 5; ECF No. 1-2 at 2.[6] The agreement provided that Dr. Drake's collection of Hemiptera-Heteroptera ("the Drake Collection") would "be presented to the Smithsonian Institution as a permanent deposit subject to the provision that he will exercise full control over the use and further development of this collection during his

---

[6] Despite its title, the document appears to be signed only by Dr. Drake and two witnesses. ECF No. 1-2 at 2.

lifetime." ECF No. 1-2 at 2. The agreement further stated that "unrestricted title" in the Drake

Collection would vest "in the Smithsonian, subject to such provisions concerning use and further

development of said collection as are provided in Dr. Drake's will, the provisions of this will being

fully known to both parties." *Id.* The agreement also stated that the Smithsonian would provide

facilities for the storage of the Drake Collection and for Dr. Drake's "continued studies and use of

the collection." *Id.*

Dr. Drake's will provided, in relevant part:

> I hereby give, devise and bequeath to the Smithsonian Institute of Washington, D.C. my entire Hemiptera-Heteroptera collection, on condition, however, that the said collection shall be kept intact as a separate unit, and that the specimens therein shall not be loaned out or sold to other institutions or individuals. The entire collection, however, shall be available for scientific study by institutions or individuals accredited for that purpose by the Smithsonian Institute.
>
> . . . .
>
> All of the rest, residue, and remainder of my estate, real or personal, of which I die seized or possessed, I give, devise and bequeath to the Smithsonian Institute of Washington, D.C. to be used and administered by the said institute, in a manner as follows:
>
> > A.   Said assets, whether in cash or in securities shall be placed in a trust fund to be known as the Drake Foundation.
> >
> > B.   The Directors of the institute shall have full control of the management and investment of said funds.
> >
> > C.   The income from the said funds shall be used by the institute as follows:
> >
> > > a.   For the purchase of specimens and collections of Hemiptera-Heteroptera to be added to my collection. I direct that the man in charge of the Hemiptera-Heteroptera shall determine and recommend the purchases to be made. During the first 10 years 50% of the income shall be used for that purpose and the balance added to the principal.
> > >
> > > b.   After the first 10 years, 75% of the income shall be used for that purpose and the balance added to the principal.

ECF No. 1-1 at 3–4.

Early the next year, Dr. Drake moved to Washington, D.C. to accept an appointment as an Honorary Research Associate at the Smithsonian.  ECF No. 1 at 3.  Dr. Drake spent the next eight years working at the Smithsonian, until his death in 1965.  *Id*.  His will was then filed in probate court in Washington, D.C., along with an unsigned copy of the 1956 agreement.  *Id.*  By letter to the attorney for Dr. Drake's estate, the Smithsonian accepted all legacies specified in the will.  ECF No. 1 at 5; ECF No. 1-3 at 2.  The Smithsonian has since managed the funds from the proceeds of Dr. Drake's estate—valued at approximately $250,000 in 1969—under the name "the Drake Foundation."  ECF No. 1 at 5; ECF No. 3-2 at 4.  The Smithsonian has maintained the Drake Collection in Washington, D.C. since Dr. Drake's death.  ECF No. 1 at 5.

## B.      The Drake Collection

The Drake Collection is kept within the Department of Entomology at the Smithsonian's National Museum of Natural History.  ECF No. 3-2 at 3.  The National Museum of Natural History is "a bureau of the Smithsonian."  *Crowley v. Smithsonian Inst.*, 636 F.2d 738, 741 (D.C. Cir. 1980).  Smithsonian employees use the collections at the Department of Entomology "for research and dissemination of knowledge, including scholarly papers, public exhibits, and responses to queries from other government agencies, the media, and the general public."  ECF No. 3-2 at 2.  The Department of Entomology routinely hosts visiting researchers from around the world and also loans parts of its collections to qualified researchers domestically and internationally.  *Id.*  While in Dr. Drake's lifetime transporting insect specimens was difficult and routinely led to their destruction, advances in safe handling and transportation techniques have made insect lending commonplace today.  *Id.* at 7–8.  Additionally, entomological researchers for the U.S. Department of Agriculture and U.S. Department of Defense use the Department of Entomology's collections to

research the ways insects affect agriculture and spread disease.  *Id.* at 2.  Since 1995, the Department of Entomology's Hemiptera-Heteroptera collection, including the Drake Collection, has been curated by Dr. Thomas J. Henry, a research entomologist for the U.S. Department of Agriculture. ECF No. 8-1 at 2.  It is currently uncertain who will take over these responsibilities should Dr. Henry retire.  *Id.*

The Drake Collection is "broad" and "scientifically significant," comprising approximately 30% of the Smithsonian's total Hemiptera-Heteroptera collection, which is itself "one of the most scientifically valuable collections in the world in terms of its size and representation of species." ECF No. 3-2 at 3, 7.  Several decades ago, the Smithsonian integrated "a small part" of the Drake Collection consisting of specimens of Plant Bugs into the rest of the Department of Entomology's Hemiptera-Heteroptera Plant Bug collection, evidently "to facilitate a research project."  *Id.* at 8 n.2.  The remainder of the Drake Collection is maintained as a separate unit, and the specimens in it are currently arranged separately from those of similar family, genus, and species in the rest of the Smithsonian's Hemiptera-Heteroptera collection.  *Id.* at 8.

According to the Smithsonian's entomologists, maintaining the Drake Collection separate from the rest of the Hemiptera-Heteroptera is inefficient and inconsistent with modern museum practice because specimens should be arranged taxonomically rather than by accession source.  *Id.* Keeping Drake Collection specimens separate "doubles the number of trips to the collections that researchers have to make to retrieve specimens and to record biological data, such as the countries in which a species occurs."  *Id.*  Over time, this arrangement makes research less efficient and causes "wasted effort [that] does not make sense."  *Id.* at 9.  Additionally, keeping the Drake Collection specimens separate from the rest of the Smithsonian's Hemiptera-Heteroptera collection takes up approximately 20–25% more storage space than integrating the collections would, making

inefficient use of the Department of Entomology's already scarce collection space.  ECF No. 8-1 at 9–10.  As of 2014, the Department expected to exhaust its collection space at the National Museum of Natural History by about 2024.  ECF No. 3-2 at 9.

Maintaining the collections separately also leads to inefficient upkeep of the specimens because "[c]uration of one collection . . . often necessarily neglects curation of the other."  ECF No. 8-1 at 10.  For example, the Smithsonian has recently endeavored to integrate a collection of 95,000 aquatic bug specimens purchased with Drake Foundation funds into the Drake Collection.  *Id.* at 3, 10.  This curation process involves relabeling existing Drake Collection specimens, updating their names, adding new species, and cataloging them in databases.  *Id.* at 10.  Yet, because the Drake Collection is maintained separately from the Smithsonian's broader Hemiptera-Heteroptera collection, all of this curation work will need to be replicated separately for the aquatic bugs not in the Drake Collection.  *Id.*  According to the Smithsonian, if the two collections were merged, "it would be much more efficient, and less wasteful, to curate all the Heteroptera holdings, Drake and non-Drake, in a single process."  *Id.*

### C.    The Drake Foundation

The Drake Foundation funds were valued at approximately $250,000 in January 1969, some four years after Dr. Drake's death.  ECF No. 3-2 at 4.  The terms of Dr. Drake's will grant the Smithsonian "full control of the management and investment of said funds." ECF No. 1-1 at 4.  For the first ten years of the Drake Foundation's existence, the will required the Smithsonian to reinvest 50% of the income from the Drake Foundation into the fund's principal, and since 1979 has required the Smithsonian to reinvest 25% of the fund's annual income.  *Id.*  The will requires the Smithsonian to use the rest of the income from the funds "[f]or the purchase of specimens and collections of Hemiptera-Heteroptera to be added to [the Drake Collection]," with the person "in

charge of the Hemiptera-Heteroptera [to] determine and recommend the purchases to be made." *Id.* The Smithsonian has used Drake Foundation funds to acquire new Hemiptera-Heteroptera specimens both by purchasing collections and by funding field collection. The amount of Drake Foundation funds the Smithsonian has spent each year has declined substantially since 2005, as illustrated in the table below:

| Fiscal Year | Income Payout | Expenditures | Income Unspent | Percent of Income Payout Spent |
|---|---|---|---|---|
| 2003 | $93,983.34 | $205,851.16 | ($111,867.82) | 219.03% |
| 2004 | $94,993.77 | $94,001.94 | $991.83 | 98.96% |
| 2005 | $96,846.42 | $102,546.82 | ($5,700.40) | 105.89% |
| 2006 | $97,043.25 | $48,358.32 | $48,684.93 | 49.83% |
| 2007 | $98,244.17 | $8,382.42 | $89,861.75 | 8.53% |
| 2008 | $102,789.96 | $22,052.12 | $80,737.84 | 21.45% |
| 2009 | $108,273.28 | $14,662.40 | $93,610.88 | 13.54% |
| 2010 | $109,804.96 | $6,643.67 | $103,161.29 | 6.05% |
| 2011 | $111,233.95 | $17,246.03 | $93,987.92 | 15.50% |
| 2012 | $113,280.58 | $30,166.89 | $83,113.69 | 26.63% |
| 2013 | $139,406.69 | $9,922.30 | $129,484.39 | 7.12% |
| 2014 | $135,896.18 | $15,789.62 | $120,106.56 | 11.62% |
| 2015 | $138,539.90 | $3,622.01 | $134,917.89 | 2.61% |
| 2016 | $146,477.59 | $3,870.34 | $142,607.25 | 2.64% |
| 2017 | $162,886.19 | $19,471.66 | $143,414.53 | 11.95% |
| 2018 | $178,367.63 | $0.00 | $178,367.63 | 0.00% |

ECF No. 5-1 at 7.[7, 8]

---

[7] The Smithsonian indicates that "computerized accounting records" for the Drake Foundation only go back to 2003. ECF No. 3-2 at 4–5. The Smithsonian also explains that twice in 2003 the Department of Entomology spent Drake Foundation funds on expenses beyond acquiring specimens: $40.47 for books about Hemiptera-Heteroptera and $4,620 for "insect drawers" to house a collection purchased with Drake Foundation funds. *Id.* at 5 n.1. The undersigned observes that these expenses appear to fall outside of the uses of Drake Foundation funds permitted by Dr. Drake's will. The United States asks for the Court's retroactive approval of the Smithsonian's uses of Drake Foundation funds and Drake Collection property that were "not entirely consistent with the terms of Dr. Drake's will." ECF No. 3 at 34 n.13. As explained below, the undersigned recommends modifying the restrictions on the Smithsonian's use of Drake Foundation funds to permit their use for research and curation but not for the purchase of physical supplies. Consequently, the undersigned does not recommend retroactively approving the purchase of insect drawers. Moreover, the undersigned finds that there is insufficient evidence in the record to determine whether the books purchased with Drake Foundation funds would tend to support scientific research into Hemiptera-Heteroptera and therefore recommends declining to retroactively approve those purchases.

[8] Although Dr. Drake's will requires "75% of the income" from the Drake Foundation to be spent acquiring Hemiptera-Heteroptera specimens with "the balance added to the principal," ECF No. 1-1 at 4, it is unclear from the will's text whether this percentage requirement should be judged annually or across some longer period. When assessed across

Unspent funds are reinvested into the Drake Foundation's principal, and as a result in 2013, the Smithsonian estimated the Drake Foundation to be valued at $3,936,330.69.  ECF No. 3-2 at 4.  Unspent income payouts since fiscal year 2013 have totaled $719,413.86, so the present value of the Drake Foundation is approximately $4,655,744.55.  ECF No. 5-1 at 7.  This figure exceeds the inflation-adjusted value of Dr. Drake's original bequest, which the Smithsonian estimates, using an unspecified measure of inflation from the Bureau of Labor Statistics, would have been worth approximately $1,575,000 in 2013.[9]  *See* ECF No. 3-2 at 4 (stating that between January 1969 and September 2013 "there was a 6.3 fold increase in inflation").

1.    Decline in Collection Availability

Since 1969, the Department of Entomology has used Drake Foundation funds to purchase approximately 12 Hemiptera-Heteroptera collections.  ECF No. 3-2 at 3.  In his declaration, Dr. Henry explains that he was involved in the four most recent major purchases: a collection acquired from Brazil in 1992 for $70,000; a collection acquired from Puerto Rico in 1996 for $35,000; a collection acquired from Germany in 2002 for $130,000; and a collection acquired from Finland in separate transactions in 2007, 2008, and 2011 for approximately $30,000.  ECF No. 8-1 at 2–3.  Dr. Henry explains that his predecessor used Drake Foundation funds for two major acquisitions: a collection from France acquired at auction in 1979 for $116,000; and a collection

---

the 15-year period for which there are computerized records, the Smithsonian's expenditures of $602,587.70 amounted only to 31.3% of the Drake Foundation's $1,928,067.86 of income.  Accordingly, while the Smithsonian's expenditures of Drake Foundation funds in 2003, 2004, and 2005 exceeded 75% of the Drake Foundation's income payout in each of those years, it is not clear that this level of spending was inconsistent with the terms of Dr. Drake's will.  As counsel for the United States explained at the hearing, "What happens is that because the Smithsonian can't spend all of the money that it gets in a given year, sometimes there is carryover from year to year which stays in the account. So to the extent it looks like the Smithsonian is spending more than it got in any given payout, that's because that would include payouts from previous years."  ECF No. 7 at 33.  In any event, the Smithsonian does not seek Court approval for the level of expenditures in those years.

[9] According to the latest version of the Bureau of Labor Statistics' Consumer Price Index calculator, Dr. Drake's original $250,000 gift would have been worth $1,767,640.45 in January 2019 dollars.  *See* CPI Inflation Calculator, Bureau of Labor Statistics, https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=250000&year1=196901&year2=201901.

acquired from a U.S. researcher in 1993 for $150,000. *Id.* at 3. For each of these acquisitions, either Dr. Henry or his predecessor became aware of the availability of these collections through their professional connections. *Id.* Dr. Henry is aware of only two to four collections that are currently available for purchase or might become available in the future, and in his judgment "there are few scientifically useful Heteroptera collections that are or will be available for purchase." *Id.* at 4–5.

In addition to these large formal collections, the Smithsonian has also used Drake Foundation funds to purchase several thousand individual specimens from various collectors over the years. *Id.* at 3–4. None of these collectors is still active, and as discussed in greater detail below, the Smithsonian believes that laws and regulations throughout the world governing the collection of biological specimens have made it considerably more difficult to develop similar private collections today. *Id.* at 3–4. Recent regulatory developments have even made obtaining export permits for extant collections "essentially impossible" in certain countries. *Id.* at 4. Dr. Henry also explains that he is "not aware of any younger scientists or enthusiasts building comparable collections in the United States or elsewhere." *Id.* at 4–5. Dr. Henry opines that based on his knowledge of the community of Hemiptera-Heteroptera entomologists and the limited number of collections that are likely to become available in the coming years, the Smithsonian "in any given year will not be able to use all or most of the [Drake Foundation's] available annual payout to purchase Heteroptera collections for the foreseeable future." *Id.* at 5.

2.     Increasing Difficulty of Field Collection

The Smithsonian has also interpreted the terms of Dr. Drake's will to permit the use of Drake Foundation funds for acquiring insects through field collection.[10] *Id.* The first of these

---

[10] The Smithsonian evidently takes a broad view of the term "purchase" in Dr. Drake's will, explaining, "The Smithsonian has . . . interpreted the term 'purchase' . . . to include acquisition of insects through field collection." ECF No.

expeditions was a 1985 field collection trip to Brazil.  ECF No. 8-1 at 5.  The expeditions involve laborious field work.  First, researchers must locate Hemiptera-Heteroptera habitats by identifying areas with an appropriate diversity of flora.  *Id.*  Then, the researchers spend long days "sampling vegetation by holding a shallow, 18 inch diameter, beating net under foliage and hitting the vegetation with a stout beating stick to dislodge specimens."  *Id.*  Over the years, Drake Foundation funds have financed 47 international field collection trips to 20 countries and more than one hundred domestic trips to 34 states and Puerto Rico, leading to the collection of over 100,000 Hemiptera-Heteroptera specimens.  *Id.* at 6–7.

For many years, financing field collection expeditions was the primary use of Drake Foundation funds, but that spending has declined significantly since 2005.  ECF No. 3-2 at 3–4.  The Department of Entomology spent $102,546.82 of Drake Foundation funds in fiscal year 2005, apparently largely on field collection.  ECF No. 5-1 at 7.  As a measure of the decline in field collection activities, in 2013 the Department of Entomology approved proposals to spend $17,370 and ultimately spent less than $10,000 that year.  ECF No. 3-2 at 5.

The Smithsonian attributes the reduction in spending on field collection to two factors.  First, the Smithsonian explains that its spending on field collection was especially high between 1994 and 2005 when a Department of Entomology scientist was conducting research and collecting specimens on remote Pacific islands.  ECF No. 8-2 at 10–11.  These expeditions were unusually

---

3-2 at 3.  Though the term "purchase" often connotes an acquisition "in exchange for payment in money or an equivalent," it also countenances broader interpretations, such as "[t]o obtain or gain in exchange for, or at the cost of, something immaterial, as effort, virtue, suffering, etc."  *Purchase*, Oxford English Dictionary (3d ed. 2007); *see also Purchase*, Webster's Third New Int'l Dictionary (online ed. 2019), *available at* http://unabridged.merriam-webster.com/unabridged/purchase ("to obtain (something desired) by an outlay (as of labor, danger, sacrifice)"); Unif. Commercial Code § 1-201 ("'Purchase' means taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property.").  The United States has not requested the Court to pass on the correctness of this interpretation, and the undersigned does not do so.

cost-intensive because they required renting boats, hiring guides, and buying provisions and sup-

plies.  *Id.*  The scientist who conducted these expeditions no longer works for the Smithsonian,

and the Department of Entomology "has not engaged in the same level of field collecting of He-

miptera-Heteroptera since 2005 and does not anticipate doing so in the future," given the idiosyn-

cratic nature of that scientist's research.  *Id.*

The Smithsonian avers that the second factor driving its decline in spending on field col-

lection is the proliferation of regulations governing the collection of insects.  The Smithsonian

attributes the increase in regulatory requirements to two international multilateral agreements, the

1992 Convention on Biological Diversity and the 2010 Nagoya Protocol on Access to Genetic

Resources.  Convention on Biological Diversity, May 6, 1992, 1760 U.N.T.S. 79; Nagoya Protocol

on Access to Genetic Resources and the Fair and Equitable Sharing of Benefits Arising from their

Utilization to the Convention on Biological Diversity, Oct. 29, 2010, 3008 U.N.T.S. 1.  According

to the Smithsonian, although the object of these agreements was to "protect and conserve biologi-

cal diversity on Earth," they have led signatory countries to adopt "restrictive access laws and

regulations" that have had "a substantial negative impact on the ability of scientists to conduct

field research and acquire biological specimens."  ECF No. 8-2 at 2–3; *accord* K. Divakaran Prath-

apan, *et al.*, *When the Cure Kills—CBD Limits Biodiversity Research*, 360 Science 1405, 1406

(2018), ECF No. 8-3 at 45–47 ("Since the CBD came into effect, and especially after the [Nagoya

Protocol] led nation states to step up legislative processes to tighten their control over genetic

resources, obtaining permits for access to specimens for noncommercial research has become in-

creasingly difficult in many countries in South Asia, East Africa, and South America, including

megadiverse countries and biodiversity hotspots."); D. Neumann, *et al.*, *Global Biodiversity Re-*

*search Tied up by Judicial Interpretations of Access and Benefit Sharing,* 18 Organisms Diversity

& Evolution 1, 2 (2018), ECF No. 8-3 at 16–27 (discussing the negative impacts restrictive access laws have had on biological research).  Indeed, as one commentator notes, these CBD-influenced regulatory changes have also impacted the lending of biological specimens because "museums may be wary of risks of loaning specimens to scientists in developing countries, fearing that their return may not be permitted."  Prathapan, 360 Science at 1406, ECF No. 8-3 at 46.

Federal law and the Smithsonian's policies require the Department of Entomology to comply with these international restrictions.  *See* 16 U.S.C. §§ 3372–3373 (providing criminal and civil penalties trading in or possessing fish or wildlife, including insects, acquired or trafficked in violation of federal, state, tribal, or foreign law); *see also* ECF No. 8-3 at 14 ("Items may be acquired by or on behalf of the [National Museum of Natural History] through field collecting only when such collecting is legally authorized.").

In his declaration, Dr. Henry explains the effects these regulatory changes have had on his attempts to collect Hemiptera-Heteroptera specimens.  ECF No. 8-1 at 7.  Before 2000, Dr. Henry traveled to Brazil for field collection trips on four occasions.  *Id.*  He has not returned since, however, because the country adopted a law in 2000 that "made it impossible for foreign workers to obtain permits or to borrow or send specimens" unless they were working on a domestic field collection project with Brazilian researchers.  *Id.*  After nearly 20 years of working to develop professional contacts in the country, Dr. Henry plans to work on one such project in October 2019; however, he remains uncertain whether the Brazilian government will allow him to bring any specimens gathered during this expedition back to the United States.  *Id.*

Dr. Henry's recent experience attempting to work in Argentina has been similar.  He has made four collection trips to the country since 2006, and over the years, the permitting require-

ments have dramatically increased. *Id.* at 7–8. On his first trip, Dr. Henry needed only one collecting permit and one export permit for the entire country, yet by the time he made his next trip in 2011, the Argentine government had adopted a law requiring him to obtain separate collection and export permits from each province, as well as an additional export permit to remove specimens from the country. *Id.* On a subsequent trip, Dr. Henry discovered that it was impossible to obtain permits in many parts of the country because there was "essentially . . . no permitting infrastructure set up in those provinces, even though permits are required by law." *Id.*

Likewise, Dr. Henry reports that although field collection in Mexico did not previously require obtaining permits, the country has recently prohibited foreign researchers from collecting biological specimens unless their work is associated with a Mexican research institution. *Id.* at 9. While Dr. Henry's professional relationships with Mexican researchers have allowed him to continue his work in the country, he opines that these requirements would prohibit field collection by the sorts of private collectors and researchers that previously sold specimens and collections to the Smithsonian. *Id.*

A letter the Smithsonian has submitted from Dr. Christiane Weirauch confirms Dr. Henry's account of the increased difficulty of field collection in recent years. ECF No. 8-3 at 68. Dr. Weirauch is a Professor of Entomology at the University of California, Riverside, and her research focuses on Hemiptera-Heteroptera. *Id.* Like Dr. Henry's declaration, Dr. Weirauch's letter describes the limitations permitting requirements have imposed on her research and field collection activities in Brazil, Ecuador, Malaysia, and Indonesia. *Id.* She explains that even when

successful, obtaining the appropriate permits can be "difficult and time consuming," and that in many parts of the world "it is impossible to obtain collecting and export permits." *Id.*

Finally, the Smithsonian explains in a declaration by Dr. Robert K. Robbins, a former co-chair of the Department of Entomology, that the increased difficulty of obtaining permits for field collection is just one of several "limitations on the amount of True Bug fieldwork that can be prudently sponsored by the Smithsonian." ECF No. 8-2 at 5. Other limitations include: (a) the significant "expertise in a particular type of insect" required for field collection, and (b) the limited time Smithsonian researchers can devote to fieldwork in light of their other responsibilities, including writing and publishing in scientific journals. *Id.* at 6. Further, fiscal constraints on the Smithsonian's budget have caused it to hire fewer scientific staff in recent years, and as a result the Smithsonian considers it unlikely that its budget will permit hiring a Hemiptera-Heteroptera expert capable of conducting fieldwork in the future. *Id.* at 9.

### D. The United States' Petition and Motion for Summary Judgment

In 2013, the United States, acting on behalf of the Smithsonian, filed a petition seeking an order applying the trust law doctrines of *cy pres* and equitable deviation to modify the restrictions in Dr. Drake's will that govern how income from the Drake Foundation may be spent and how the Drake Collection may be used. ECF No. 1 at 14. The United States seeks permission for the Smithsonian to use 75% of the annual income from the Drake Foundation "for the benefit of the Smithsonian's entire Hemiptera-Heteroptera collection, not just the Drake Collection." *Id.* Specifically, it proposes using Drake Foundation funds for three purposes. First, to support scientific research of its Hemiptera-Heteroptera holdings, including the Drake Collection, "by employees (including a possible endowed position), graduate students, post-doctorate students, and visiting scientific experts . . . and to support those persons in curating and improving the quality of the

collection." *Id.*  Second, to "support Hemiptera-Heteroptera technicians to prepare (e.g., mount and label) specimens and help with other efforts related to [the Smithsonian's entire] Hemiptera-Heteroptera collection, including maintaining the collection, entering collections information into [the museum's] collections database, and imaging specimens to create digital photographic records." *Id.*  And third, to "purchase cabinets, drawers, and other standard entomological museum supplies needed to house and preserve [the entire] Hemiptera-Heteroptera collection." *Id.*

As for relief from the will's restrictions on the use of the Drake Collection, the United States seeks permission for the Smithsonian to integrate the specimens from the Drake Collection into the Museum of Natural History's broader Hemiptera-Heteroptera collection, provided that the Drake Collection specimens must continue to be identified as part of the Drake Collection. *Id.*  It also seeks permission for the Smithsonian to loan out Drake Collection specimens "to qualified researchers consistent with Smithsonian and National Museum of Natural History collection management policies." *Id.* at 15.

In 2014, the United States moved for summary judgment, noting that it was not aware of any person with sufficient interest in the outcome of these proceedings to be joined as a party or permitted to intervene and that no person had opposed the motion or filed any opposition on the Court's docket.  ECF No. 3 at 24–25.  Nevertheless, "out of an abundance of caution," the United States mailed via first class mail a copy of its petition to the last known address of Kay Ann Dewitt, née Drake. *Id.* at 24.  The United States identifies Ms. Dewitt as the only living person mentioned in Dr. Drake's will. *Id.*  The United States also published a notice of its intent to file its petition in the *Washington Post* and the *Advertiser-Tribune*, the local newspaper for Tiffin, Ohio where Dr. Drake was born. *Id.*  Despite these efforts, no party has appeared to contest the petition.

On March 12, 2019, the undersigned held a motion hearing where the United States argued in favor of its proposed modifications. ECF No. 7. The undersigned permitted the United States to supplement the record, and it subsequently filed additional declarations in support of the petition. *Id.* at 58–61; ECF No. 8.

## II.    DISCUSSION

The United States' petition raises several threshold issues, including: (a) the Court's subject matter jurisdiction and the justiciability of the request, (b) the applicable substantive law, and (c) notice to any other interested parties. Before turning to the substance of the petition, each of these issues will be addressed below.

### A.    Jurisdiction and Justiciability

The government asserts that the Court has subject matter jurisdiction over the petition under 28 U.S.C. §§ 1331 and 1345. ECF No. 3 at 25. The undersigned agrees. The Court has federal question jurisdiction under 28 U.S.C. § 1331 because this case involves determining the extent of the Smithsonian's obligation to comply with the conditions of Dr. Drake's will under 20 U.S.C. § 55. *See* 28 U.S.C. § 1331 (providing district courts with original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States"); *In re U. S. ex rel. Smithsonian Inst.*, 485 F. Supp. 1222, 1226 (D.D.C. 1980) (finding subject matter jurisdiction based on 28 U.S.C. § 1331 in a case resolving a similar petition to modify gift restrictions); *see also* ECF No. 1 at 2 (explaining that the Smithsonian's "duties and obligations are defined by the laws of the United States"); ECF No. 3 at 27 n.8 (contending that the Smithsonian is bound by the terms of Dr. Drake's will by virtue of 20 U.S.C. § 55). Because the Petitioner here is the United States on behalf of the Smithsonian, an instrumentality of the United States, the Court also has subject matter

jurisdiction under 28 U.S.C. § 1345.  *See* 28 U.S.C. § 1345 ("[T]he district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States."); *see also Smithsonian Inst.*, 485 F. Supp. at 1226 (finding subject matter jurisdiction based on 28 U.S.C. § 1345); *U.S. ex rel. Small Bus. Admin. v. Pena*, 731 F.2d 8, 11 (D.C. Cir. 1984) (observing that 28 U.S.C. § 1345 "applies to suits in which the United States is a plaintiff").

Further, this action presents a justiciable case or controversy.  "Traditionally, courts in equity have heard petitions for instructions [from trustees] and have issued declaratory judgments if there is a reasonable doubt as to the extent of the trustee's powers or duties."  Unif. Trust Code § 201, cmt.; *accord McIntosh v. Washington*, 395 A.2d 744, 748–49 (D.C. 1978) (recognizing the justiciability of "suits for instructions to a trustee or for the construction of a will"); D.C. Code § 19-1302.01 (granting courts jurisdiction over cases where an interested person invokes the court's jurisdiction, or where a trustee requests instructions or a declaration of rights).  In federal courts, declaratory judgments constitute justiciable cases or controversies where they resolve "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1040 (D.C. Cir. 1981) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)); *cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992) (explaining that Article III standing requires plaintiffs to demonstrate: (1) that they have suffered an injury in fact, (2) that the injury is fairly traceable to the challenged condition, and (3) that a favorable decision can redress the injury).  Here, because the United States seeks to do something it is currently barred from doing—use the Drake Foundation and the Drake Collection

18

for purposes beyond those permitted in Dr. Drake's will—the undersigned recommends finding that this matter presents a justiciable case or controversy.

### B.    Applicable Substantive Law

The United States contends that the Drake Foundation and Drake Collection are governed by the terms of Dr. Drake's will because of the statutory requirement that the Smithsonian dispose of any property it receives "by gift, bequest, or devise" "in promotion of the purposes thereof." 20 U.S.C. § 55; *see also* 20 U.S.C. § 56 (requiring the Smithsonian to use non-appropriated funds in a manner "best suited for the promotion of the purpose of the testator").   Finding those terms unduly restrictive, the United States asks this Court to modify them under the court's "inherent equity powers" and under the trust law doctrines of equitable deviation and *cy pres*.[11]   ECF No. 3 at 26–36.

As a general matter, trust law doctrines "govern[] charitable dispositions, whether in trust or by outright disposition to charities." 15 Am. Jur. 2d Charities § 145; *see also Obermeyer v. Bank of Am., N.A.*, 140 S.W.3d 18, 24 (Mo. 2004), *as modified on denial of reh'g* (Aug. 24, 2004) (applying the trust doctrine of *cy pres* to modify conditions on an absolute gift to a university in order "to carry out [the testator's] intent"); *In re Earl & Mabel Nellis Athletic Fund of Canajoharie Cent. Sch. Dist. No. 1*, 247 N.Y.S.2d 752, 755 (Sur. Ct. 1964) (applying *cy pres* to modify the permissible uses of an absolute gift made to a school district); Bogert, *The Law of Trusts and Trustees* § 431 (2018) ("The cy pres power is applied to absolute gifts to charitable corporations or other organizations, as well as to gifts in trust. . . ." (footnote omitted)).   While the undersigned

---

[11] The Smithsonian appears to doubt whether Dr. Drake's will formally created a trust, contending instead that the provisions pertaining to the Drake Foundation created a "restricted endowment fund" and those pertaining to the Drake Collection created a "restricted collection."   *See* ECF No. 3 at 27 n.8.   As discussed below, the undersigned recommends finding that Washington, D.C. trust law applies to the United States' requests to modify the restrictions on the Smithsonian's use of the Drake Foundation and Drake Collection, regardless of whether Dr. Drake's will formally created a trust.

is not aware of any cases expressly interpreting the Smithsonian's obligations under 20 U.S.C. § 55, consistent with this case law, courts have used trust law doctrines to analyze the Smithsonian's duty to comply with restrictions on gifts.  *See Smithsonian Inst.*, 485 F. Supp. at 1235 (applying District of Columbia trust law principles to determine what limitations applied to the Smithsonian's use of funds given subject to restrictions); *see also Gellatly v. United States*, 71 F. Supp. 357, 359 (Ct. Cl. 1947) (applying common law principles of equity to determine the validity of a gift to the Smithsonian).   Applying those doctrines here to determine whether to modify the Smithsonian's duty to comply with restrictions on its use of property and funds in its possession is especially appropriate in light of the Smithsonian's history as a trust.  *See Dong v. Smithsonian Inst.*, 125 F.3d 877, 883 (D.C. Cir. 1997) (explaining that, as relates to the Smithsonian, the "United States, as trustee, holds legal title to the original Smithson trust property and later accretions"); David P. Currie, *The Smithsonian*, 70 U. Chi. L. Rev. 65 (2003) (reviewing the history of the establishment of the Smithsonian as the "trustee" of James Smithson's estate and of its subsequent acquisitions); *see also* ECF No. 1 at 2 (explaining that "the Smithsonian carries out the trust obligations of the United States").

The United States contends that in resolving this matter the Court should apply the Uniform Trust Code ("UTC"), as adopted by the District of Columbia.  *See* ECF No. 7 at 12–14.  The undersigned agrees.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991) (observing that where a federal statutory scheme fails to supply a necessary rule of decision, federal courts should use state law to "fill the interstices" except in cases where the scheme (a) requires nation-wide legal standards, or (b) express provision of another federal statute "embod[ies] congressional policy choices readily applicable to the matter at hand").  Trusts are governed either by the law of the jurisdiction designated in the instrument creating the trust, or by the jurisdiction with "the most

significant relationship to the matter at issue."  D.C. Code § 19-1301.07; *see also* Restatement

(Second) of Conflict of Laws § 268 & cmt f (explaining that where the instrument creating a trust

does not specify what law should apply to its construction, the instrument should be construed "in

accordance with the rules of construction of the state which the testator would probably have de-

sired to be applicable" and that absent evidence of the testator's contrary intent, "ordinarily the

courts will apply the rule of construction of the testator's domicil at death").

Here, Dr. Drake's will does not specify what state or locality's law should apply to its

construction and interpretation.  *See* ECF No. 1-2 at 3–5.  Although it was drafted and signed in

Ames, Iowa, Dr. Drake's will was probated in Washington, D.C., where Dr. Drake lived from

1957 until his death in 1965.  ECF No. 1 at 3; ECF No. 1-1 at 3.  Moreover, in each paragraph

where Dr. Drake identifies the Smithsonian as the recipient or trustee of his property, he expressly

identifies the Smithsonian as being in Washington, D.C.  ECF No. 1-1 at 3–4.  Accordingly, while

it is perhaps not strictly binding on federal instrumentalities, *see Hancock v. Train*, 426 U.S. 167,

167 (1976) (barring states from regulating federal instrumentalities in the absence of a "clear con-

gressional mandate"), the undersigned recommends applying Washington, D.C.'s trust law in an-

alyzing whether to modify the restrictions in Dr. Drake's will.[12]

### C.    Notice

The United States seeks to proceed *ex parte* and contends that it was not required to provide

notice of its petition to Dr. Drake's descendants or any other person because no person or entity

besides the United States an interest in this action.  The undersigned agrees.

---

[12] Courts applying the UTC may also reference the common law of trusts and principles of equity to supplement the code's provisions, except where they conflict.  D.C. Code § 19-1301.06.  Accordingly, this report and recommendation also draws on the common law of trusts where appropriate.

While the UTC provides that the "settlor of a charitable trust, among others, may maintain a proceeding to enforce the trust," D.C. Code § 19-1304.05(c), courts interpreting this UTC provision have not found that it conveys any right of enforcement to a settlor's heirs, absent a reversionary interest in the trust property. *See Stone v. Washington Reg'l Med. Ctr.*, 515 S.W. 3d 104, 110 (Ark. 2017) ("[T]he Stone heirs' argument is misplaced because they are not the settlors who established the charitable trust in the 1909 Deed.  Nor are they the 'among others' contemplated [under the UTC] because they, as the settlors' heirs, no longer possess an interest in the property."); *cf. Family Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 244 (D.C. 2015) (finding co-settlors and corporate successors-in-interest may assert the settlor's right to enforce the terms of charitable trust); *Smithers v. St. Luke's-Roosevelt Hosp. Ctr.*, 723 N.Y.S.2d 426, 434 (N.Y. App. Div. 2001) (finding court-appointed administrix of a settlor's estate retained standing to enforce a charitable trust); *accord* Restatement (Third) of Trusts § 94 (2012) (observing that while a settlor has standing to enforce the terms of a restricted gift to a charitable organization, "absent contrary provision or agreement, settlor standing is 'personal'" and may only be exercised by the settlor himself, an incapacitated settlor's personal fiduciary, or by a deceased settlor's personal representative while the estate is being administered).  Where there is no right of reversion, a settlor's estate has no standing to intervene in a trust's application for *cy pres* or deviation relief.  *See Georgia O'Keeffe Found. (Museum) v. Fisk Univ.*, 312 S.W.3d 1, 13 (Tenn. Ct. App. 2009) ("We have determined as a matter of law that the O'Keeffe Museum has no reversionary interest in the ninety-seven pieces from the Stieglitz Estate and no reversionary interest in the four pieces formerly owned by Georgia O'Keeffe; therefore, the O'Keeffe Museum has no standing to participate as a party in this action.").

Here, as the United States correctly notes, Dr. Drake's will did not create a reversionary interest in an heir or other person.  ECF No. 3 at 30 n.12.  Unless they include clear language to the contrary, testamentary gifts do not create reversionary interests.  *See* Restatement (Third) of Property (Wills & Don. Trans.) § 24.2 (2011) ("Because the fee simple absolute (land) and absolute ownership (personal property) are present interests that are unlimited in duration, they are never followed by a future interest."); *cf.* D.C. Code § 42-701 ("No words of inheritance shall be necessary in a deed or will to create a fee simple estate; but every conveyance or devise of real estate shall be construed and held to pass a fee simple estate or other entire estate of the grantor or testator, unless a contrary intention shall appear by express terms or be necessarily implied therein."); *In re Glover's Estate*, 463 F.2d 1238, 1241 (D.C. Cir. 1972) (applying the statute now codified at D.C. Code § 42-701 and holding that a testamentary gift of the residue of an estate creates a fee simple interest).  Here, the terms of the will transferring the Drake Collection and Drake Foundation to the Smithsonian did so without granting a reversionary interest to any other person.  *See* ECF No. 3-1 at 9 ("I hereby give, devise and bequeath to the Smithsonian . . . my entire Hemiptera-Heteroptera collection."); *id.* at 9–10 ("All of the rest, residue, and remainder of my estate . . . I give, devise and bequeath to the Smithsonian.").  Without a property interest at stake, Dr. Drake's descendants are without standing to seek enforcement of the restrictions Dr. Drake's will imposes on the Drake Foundation and Drake Collection.

More generally, private individuals typically lack standing to enforce the terms of a charitable trust "because the interest in ensuring that charitable trust property is put to proper purposes is properly that of the community at large."  *Hooker v. Edes Home*, 579 A.2d 608, 612 (D.C. 1990).  For this reason, normally "only a public officer, usually the state Attorney General, has standing to bring an action to enforce the terms of the trust."  *Id.*  Here, the United States Department of

Justice, which acts under the auspices of the Attorney General of the United States, has brought the present petition on behalf of the Smithsonian.

The undersigned notes that one court in this District denied without prejudice a similar motion by the United States on behalf of the Smithsonian because the court found the United States had not complied with the UTC's notice requirements. *United States ex rel. Smithsonian Inst.*, No. 17-mc-3005 (TSC), 2018 WL 3838826, at *4 (D.D.C. June 26, 2018).   In that case, several of the donor's descendants had objected to the Smithsonian's past failures to comply with the terms of a gift. *Id.*, at *1–2.   The court analyzed the Smithsonian's method of communicating with these objecting relatives and found it wanting under the UTC and the Federal Rules of Civil Procedure, *id.*, at *3–4, but the court presupposed, without analysis, that notice was in fact required.   As explained above, the undersigned recommends finding that because no party besides the United States has any justiciable interest in the Drake Collection or Drake Foundation property, the United States was not required to give any party notice of these proceedings.

In any event, even if Dr. Drake's descendants were entitled to notice, the undersigned observes that the United States' efforts here to notify them of its petition would satisfy the UTC's requirements.   Under the UTC, notice "must be accomplished in a manner reasonably suitable under the circumstances and likely to result in receipt of the notice or document."   D.C. Code § 19-1301.09(a).   This standard is flexible.   Permissible methods of notice include sending a document by "first-class mail, personal delivery, delivery to the person's last known place of residence or place of business, or a properly directed electronic message."   *Id.*   The UTC further provides that "[n]otice otherwise required . . . to be sent . . . need not be provided to a person whose identity or location is unknown or location is unknown to and not reasonably ascertainable by the trustee."   D.C. Code § 19-1301.09(b).   Here, the United States sent a copy of its petition via first-class mail

to the last-known address of Dr. Drake's great niece, the only person named in Dr. Drake's will who is believed to be living.  ECF No. 1 at 13–14; ECF No. 2 at 2; ECF No. 7 at 22–25.  The United States also published a notice of its intent to file this petition in the *Washington Post* and the Tiffin, Ohio *Advertiser-Tribune*, the local newspaper in the town where Dr. Drake was born. ECF No. 2 at 2; ECF No. 2-2 at 2–3; ECF No. 7 at 23–24.[13]  This is "reasonably suitable under the circumstances," and the UTC requires no more.  *See* D.C. Code § 19-1301.09(a); *cf. Smithsonian*, 2018 WL 3838826, at \*3 (explaining that in that case there was "no indication that the Smithsonian provided notice to [some of the] heirs of its plan to file this Petition").

Accordingly, the undersigned recommends permitting the United States to proceed with its petition *ex parte*.

### D.   The Smithsonian's Proposed Modifications to the Restrictions Imposed by Dr. Drake's Will

As to the merits of its petition, the United States argues that this Court should modify the restrictions on the Smithsonian's use of Drake Collection specimens and Drake Foundation funds pursuant to the trust law doctrines of *cy pres* and equitable deviation.  ECF No. 3 at 31–37.  As explained below, the undersigned recommends finding that the restrictions on the Drake Foundation's funds have become impracticable or wasteful, and that some modification is in order under the doctrine of *cy pres*.  However, the undersigned also recommends finding that some of the United States' proposed alternative uses of the funds stray too far from Dr. Drake's original charitable purposes.  Similarly, the undersigned recommends finding that the requirement to maintain the Drake Collection apart from the rest of the Smithsonian's Hemiptera-Heteroptera collection

---

[13] The United States has received no responses as a result of these efforts, and no party has appeared to contest the petition.  ECF No. 2 at 2; ECF No. 7 at 23.

has become wasteful and that the museum should be permitted to integrate the collections. Nevertheless, the undersigned recommends finding that the United States has not demonstrated that lifting the prohibition on loaning out Drake Collection specimens is warranted.

        1.     Restrictions on Drake Foundation Funds

           a.     Equitable Deviation

The doctrine of equitable deviation would not allow the United States' proposed modifications to the restrictions on the Smithsonian's use of the Drake Foundation's funds. That doctrine permits a court to modify the administrative or distributive provisions of a trust where "(a) 'because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust,' or (b) 'if continuation of the trust on its existing terms would be impracticable or wasteful or impair the trust's administration.'" *In re D.M.B.*, 979 A.2d 15, 25 (D.C. 2009) (internal citations omitted) (quoting D.C. Code § 19-1304.12); *see also* Restatement (Third) of Trusts § 66 (2003) (same). However, it is not appropriate to use equitable deviation to modify a trust's substantive terms. *See In re of Estate of Wilson*, 452 N.E.2d 1228, 1234 (N.Y. 1983) (explaining that equitable deviation differs from *cy pres* "in that '[t]hrough exercise of its deviation power the court alters or amends administrative provisions in the trust instrument but does not alter the purpose of the charitable trust or change its dispositive provisions.'" (quoting Bogert, *The Law of Trusts and Trustees* § 394 (2d. ed.))); *Daloia v. Franciscan Health Sys. of Cent. Ohio, Inc*, 679 N.E.2d 1084, 1092 (Ohio 1997) ("[I]n applying the doctrine of [equitable] deviation, a court cannot change the original charitable objective of the settlor or divert the bequest to an entity with a charitable purpose different from the purpose set forth in the trust instrument."); *see also* 15 Am. Jur. 2d Charities § 149 ("Equitable deviation can be distinguished from the somewhat similar doctrine of cy pres in that equitable deviation deals only with changes in the administrative provisions of a

trust, while cy pres involves an alteration of the purpose to which the res of the trust is to be applied.").

A restriction in a trust instrument is incidental or administrative if deviation from the restriction would not affect the trust's purpose. *See Wilson*, 452 N.E.2d at 1234 (finding that a trust provision requiring a school district to certify a list of students eligible for a scholarship was "an incidental part of the trust's administrative requirements" where "[t]he same result intended by the testator may be accomplished by permitting the students to apply directly to the trustee"); *Daloia*, 679 N.E.2d at 1092 ("[A]dministration of a trust involves the methods of accomplishing the purposes of the trust.").

Here, Dr. Drake's will specifies that the Smithsonian "shall" use the income from the Drake Foundation "[f]or the purchase of specimens and collections of Hempiptera-Heteroptera to be added to [the Drake Collection]."  ECF No. 1-1 at 4.  The United States has requested to modify the will's restrictions to permit the Smithsonian "to use the payout from the Drake Foundation for [] *purposes in addition to* the purchasing of Hemiptera-Heteroptera collections to add to the Drake Collection."  ECF No. 3 at 20 (emphasis added).  This proposal is no mere change to restrictions on how the Smithsonian *administers* the Drake Foundation funds.  Indeed, the Smithsonian already has "full control" over that; the will grants the Smithsonian "full control of the management and investment" of the Drake Foundation funds.  ECF No. 1-1 at 4.  What the United States proposes here is to expand the range of purposes for which the Drake Foundation may be used.  That would amount to a change to the substantive terms of how the Drake Foundation funds are spent.  Accordingly, the undersigned recommends finding that the doctrine of equitable deviation would not permit the United States' proposed modifications to the restrictions on the Smithsonian's use of

the Drake Foundation.  Rather, those proposals are more properly addressed under the doctrine of *cy pres*, as discussed below.

        b.      *Cy pres*

        i.      Whether Modifications Are Warranted

A court may modify the substantive terms of a charitable trust where the party seeking *cy pres* relief can show: (1) a charitable purpose of the trust has become illegal, impracticable, impossible, or wasteful; and (2) the proposed modification is as near as possible to the settlor's charitable purpose. *Trs. of the Corcoran Gallery v. District of Columbia*, 2014 D.C. Super LEXIS 17, at *35–36 & n.13 (D.C. Sup. Ct. 2014).  A court may find compliance with a trust's terms has become impracticable or wasteful even where it is not literally impossible.  *See id*. at *47–48 (finding compliance with a trust's terms impracticable where the trustees had not demonstrated impossibility); *In re Elizabeth J.K.L. Lucas Charitable Gift*, 261 P.3d 800, 807 (Haw. Ct. App. 2011) (finding that for *cy pres* to apply it is "sufficient that achieving the settlor's stated purpose would be impracticable or unreasonable to effectuate").

To demonstrate impracticability, a party must show that complying with the trust's current terms "would be unreasonably difficult, and that it is not viable or feasible." *Corcoran Gallery*, 2014 D.C. Super LEXIS at *38–39; *see also United States ex rel. U.S. Coast Guard v. Cerio*, 831 F. Supp. 530, 540 (E.D. Va. 1993) (applying *cy pres* to modify restrictions on a gift to the United States Coast Guard Academy where its leadership testified that the terms of the gift would violate Academy policy and would "wreak such havoc on the Academy that the Coast Guard would be compelled to refuse the gift in the absence of any change in its terms"); *In re Stuart's Estate*, 46 N.Y.S.2d 911, 915–16 (Sur. Ct. 1944) (finding that cultural changes between 1891 and 1944 rendered the requirement that an art collection not to be exhibited on Sundays impracticable because

nearly all exhibition spaces were now open on Sundays, making it uncertain that the trustees could find a location to accept the collection).  Similarly, a trust restriction is wasteful where "the amount of property held in the trust exceeds what is needed for the particular charitable purpose to such an extent that the continued expenditure of all of the funds for that purpose, although possible to do, would be wasteful."  Restatement (Third) of Trusts § 67 cmt. c(1); *see also Sharpless v. Medford Monthly Meeting of Religious Soc. of Friends*, 548 A.2d 1157, 1160 (N.J. Super. Ct. App. Div. 1988) ("To the extent that the trust income exceeds maintenance and preservation costs, application of *cy pres* is appropriate since there is an impossibility of using the excess income to advance the particular charitable purpose expressed by the donors.").

The United States proposes employing the doctrine of *cy pres* to permit the Smithsonian to use the income from the Drake Foundation to support scientific research into its entire Hemiptera-Heteroptera collection, including through a possible endowed position; curating and maintaining the entire collection; preparing specimens; entering collections information in databases and creating photographic records; and purchasing supplies used to store and maintain the entire collection.[14]  ECF No. 3 at 20.  The United States argues that modifying the restrictions on the Smithsonian's use of the income from the Drake Foundation in these ways is justified because Dr. Drake could not have foreseen that recent increases to the regulatory restrictions on the collection of insects would make it very difficult for the Smithsonian to purchase or otherwise acquire new Hemiptera-Heteroptera specimens with the funds in the Drake Foundation.  *Id.* at 33.  As a result of these regulatory burdens, the Smithsonian's acquisition of new Hemiptera-Heteroptera collections has declined to such an extent that it has spent no more than 27% of the annual payout from

---

[14] The undersigned notes that the United States has not requested any changes to the will's requirement that the Smithsonian spend no more than 75% of the Drake Foundation's annual payout and that it reinvest the remaining 25%. Accordingly, the undersigned recommends finding that this limitation is unaffected by the petition.

the Drake Foundation since 2006.  ECF No. 5 at 2; ECF No. 5-1 at 7.  The United States argues that the resulting accumulation of Drake Foundation funds therefore justifies expanding the purposes to which those funds might be applied because courts should apply *cy pres* "where trusts have built up a surplus of funds that cannot be spent in the precise manner directed" and where a charitable purpose "has become impracticable or wasteful because of societal changes that occur due to the passage of time."  ECF No. 3 at 19–20, 35.

The undersigned agrees.  The United States has demonstrated that the provision in Dr. Drake's will requiring the Smithsonian to spend Drake Foundation funds only on the acquisition of new Hemiptera-Heteroptera specimens for the Drake Collection has become impracticable and wasteful.  Although the will requires the Smithsonian to spend up to 75% of the Drake Foundation's annual income acquiring new Hemiptera-Heteroptera specimens, the Smithsonian has been unable to meet that spending requirement for more than a decade by honoring the restrictions that Dr. Drake placed on the use of these funds.  *See* ECF No. 5-1 at 7.  Since 2003, the earliest year for which computerized records exist, the Smithsonian has only spent 31.3% of the Drake Foundation's annual income.  *Id.*

The problem shows no sign of abating.  If anything, it is getting worse.  The Smithsonian has reinvested the unspent funds, leading the Drake Foundation's principal to accumulate, thereby causing the annual payouts themselves to nearly double from $93,983.34 in 2003 to $178,367.63. *Id.*  Even in 2012, the year with the highest expenditures in the past decade, the Smithsonian was only able to spend $30,166.89, or 26.63% of that year's payout.  *Id.*  Given the accumulation of funds over recent years, even 2012 spending levels would now only amount to 16.9% of the annual

payout.  As Dr. Henry, the Drake Collection's current curator, observed, it appears that the Smith-sonian is unlikely to be able to spend "all or most of the available annual payout to purchase Het-eroptera collections for the foreseeable future."  ECF No. 8-1 at 5.

This is not for want of trying.  The Smithsonian has continued to pursue purchasing He-miptera-Heteroptera collections and specimens as they become available, but the number of these collections has declined in recent years as a result of both a decrease in the number of active col-lectors as well as a global increase in permitting requirements that have rendered field collecting significantly more difficult.  *Id.* at 3–5.  The Smithsonian has also continued to use Drake Foun-dation funds for field collection expeditions, even as changes to the global regulatory landscape have made such activities more difficult.  *Id.* at 7–9; ECF No. 8-2 at 2–11.  Budget constraints, limited staff, and the fact that entomological fieldwork requires considerable training and expertise all further limit the amount of fieldwork the Smithsonian can undertake.  ECF No. 8-2 at 9.

Accordingly, while it may not be literally impossible for the Smithsonian to comply with the requirement in Dr. Drake's will that it spend 75% of the Drake Foundation's annual payout on acquiring new Hemiptera-Heteroptera specimens—because it could always, say, substantially overpay for whatever specimens it does acquire—the undersigned recommends finding that the requirement has become impracticable and wasteful.  *See Corcoran Gallery*, 2014 D.C. Super LEXIS at *38–39; *Cerio*, 831 F. Supp. at 540; *J.K.L. Lucas*, 261 P.3d at 807.

ii.      The United States' Proposed Modifications

Having recommended finding that the restriction Dr. Drake's will imposes on the Smith-sonian's use of the Drake Foundation is impracticable and wasteful, the undersigned now turns to the United States' proposed alternative uses for the funds.  It argues that the Smithsonian should be permitted to use up to 75% of the income from the Drake Foundation for the following purposes,

in addition to acquiring new Hemiptera-Heteroptera specimens: (1) supporting scientific research into Hemiptera-Heteroptera, including through a possible endowed position; (2) curating and maintaining the Smithsonian's entire Hemiptera-Heteroptera collection through preparing new specimens, entering collections' information in databases, and creating photographic records; and (3) purchasing supplies used to store and maintain the entire Hemiptera-Heteroptera collection. ECF No. 3 at 20.  As explained below, the first two of these proposed uses are consistent with, and as near as possible to, Dr. Drake's original purpose as expressed in his will, but the third strays too far from that purpose to be permissible under *cy pres*.

Under the UTC, once a court has found that a charitable trust's purpose warrants modification because it is impracticable or wasteful, the court "may apply *cy pres* to modify or terminate the trust by directing that the trust property be applied or distributed, in whole or in part, in a manner consistent with the settlor's charitable purposes."  D.C. Code § 19-1304.13; *see also* Restatement (Third) of Trusts § 67 (2003) ("[T]he court will direct application of the property or appropriate portion thereof to a charitable purpose that reasonably approximates the designated purpose.").  When using *cy pres* to modify the terms of a trust, courts should be "guided by the principle that preservation of the testator's purposes is paramount and that alterations to the trust fashioned to eliminate any impossibility or impracticality of performance, must, as much as possible, result in a trust that effectuates the testator's original purposes." [15]  *Cerio*, 831 F. Supp. at 541.  In divining the settlor's original purposes, courts should consider the language of the trust

---

[15] Some commentators have suggested that the UTC's phrasing of the distributive rule "suggests a broader conception of *cy pres* than the traditional notion that the assets be applied 'as near as possible' to the settlor's original charitable intent."  *See* Alberto B. Lopez, *A Revaluation of Cy Pres Redux*, 78 U. Cin. L. Rev. 1307, 1335 (2010).  However, the undersigned is not aware of any decision interpreting the UTC's formulation as relaxing the requirement that courts ensure proposed modifications conform to the settlor's original purpose "as near as possible."  *See Corcoran Gallery*, 2014 D.C. Super LEXIS, at *35–36 & n.13 (applying D.C. Code § 19-1304.13 and explaining that courts should ensure a "proposed modification is as near as possible to the settlor's charitable purpose"); *see also Estate of Alexander v. Sparks Reg'l Med. Ctr.*, 533 S.W.3d 618, 629 (Ark. Ct. App. 2017) (applying "as near as possible" test to UTC language).

instrument and related documents, as well as other evidence of the settlor's interests.  *See Corcoran Gallery*, 2014 D.C. Super. LEXIS at, *66 (explaining that the court "must examine both the Deed of Trust itself and any relevant surrounding circumstances evidencing [the settlor's] intent"); Bogert, *The Law Of Trusts And Trustees* § 442 (explaining that courts "should give careful study to the wording of the [trust] instrument with respect to the gift in question" and that "[t]he tastes and interests of the settlor and other gifts made by him during his life or by the trust instrument have an important evidentiary effect").

As expressed in his will, Dr. Drake's purpose in establishing the Drake Foundation was for the Smithsonian to use the funds "[f]or the purchase of specimens and collections of Hemiptera-Heteroptera to be added to [the Drake Collection]," with "the man in charge of the Hemiptera-Heteroptera [determining] and recommend[ing] the purchases to be made."  ECF No. 1-1 at 4.  Yet the purpose of the gift was not narrowly acquisitive.  Dr. Drake's will more generally requires that the specimens in the Drake Collection, including those acquired with Drake Foundation funds, "shall be available for scientific study by institutions or individuals accredited for that purpose."  ECF No. 1-1 at 3.  Thus, the undersigned recommends finding that Dr. Drake's will establishing the Drake Foundation reflects two purposes: acquiring additional Hemiptera-Heteroptera speci-mens to add to the Drake Collection and increasing opportunities to study and research Hemiptera-Heteroptera.

Seen through that lens, the United States' first proposal to permit the Smithsonian to use income from the Drake Foundation to fund research and curation of the entire Hemiptera-Heter-optera collection by employees, graduate students, and visiting experts is consistent with and as near as possible to Dr. Drake's specific purpose of adding Hemiptera-Heteroptera specimens to his collection and promoting the research and study of that order of insects.  For one thing, the

will's explanation that the person "in charge of the Hemiptera-Heteroptera" should determine which collections and specimens to add to the Drake Collection indicates that Dr. Drake expected personnel at the Smithsonian with entomological expertise would manage the Drake Collection and Drake Foundation.  The Smithsonian has represented that once Dr. Henry retires, it is uncertain whether—without changes to the restrictions on Drake Foundation funds—it will be able to hire another Hemiptera-Heteroptera specialist.  ECF No. 8-2 at 9–10.  Because obtaining new Hemiptera-Heteroptera specimens, either through purchase or field collection, has become more challenging of late, allowing the Smithsonian to use Drake Foundation funds as the United States has proposed would permit it to hire a "qualified True Bug expert" to navigate the evidently baroque permitting requirements involved with entomological fieldwork and acquisitions.  ECF No. 8-1 at 7–9; ECF No. 8-2 at 9–10; ECF No. 8-3 at 68.  Permitting the Smithsonian to use the Drake Foundation to fund research and curation of the Smithsonian's Hemiptera-Heteroptera holdings is therefore consistent with Dr. Drake's original purposes in creating the Fund because it increases the Smithsonian's capacity to add specimens to the collection and to promote research into Hemiptera-Heteroptera, both of which Dr. Drake plainly desired.

Funding the work of graduate students and visiting researchers could likewise improve the Smithsonian's capacity to acquire additional Hemiptera-Heteroptera specimens, and not only because these researchers could acquire new specimens directly through fieldwork.  ECF No. 8-2 at 10.  It appears that research interest in Hemiptera-Heteroptera—the subject which Dr. Drake made his life's work—is on the wane and that using the Drake Foundation to fund research by graduate students and others would increase the likelihood that Hemiptera-Heteroptera specimens continue to be collected and studied.  *See* ECF No. 8-1 at 5 ("My judgment about the unlikely availability of Heteroptera collections in the future is based in part on the fact that I am not aware of any

younger scientists or enthusiasts building comparable collections in the United States or else-where."); ECF No. 8-3 at 68 ("In addition to the breadth and depth of its specimen holdings, the significance and value of a natural history collection also lies with how well this collection is curated and to what extent it supports research and training of the next generation of heteropteran researchers."). Accordingly, the undersigned recommends finding that the United States' first proposal to permit the Smithsonian to use Drake Foundation income to support scientific research is consistent with, and as near as possible to, Dr. Drake's charitable purposes.

For similar reasons, the undersigned recommends finding that the United States' second proposal to allow the Smithsonian to spend Drake Foundation income to pay for the physical prep-aration and mounting of specimens, and to create and enter photographic records into databases, is consistent with, and as near as possible to, Dr. Drake's charitable purposes. As noted above, not only does Dr. Drake's will require the Smithsonian to add Hemiptera-Heteroptera specimens acquired with Drake Foundation funds to the Drake Collection, it also requires the Drake Collec-tion to be "available for scientific study." ECF No. 1-1 at 3. As with funding research, spending the income from the Drake Foundation to curate and photograph the collection may similarly pro-mote the long-term study and collection of Hemiptera-Heteroptera by facilitating future genera-tions' access to these specimens. *See* ECF No. 8-1 at 5; ECF No. 8-3 at 68; *see also* Blagoderov, *et al.*, *No specimen Left Behind: Industrial Scale Digitization of Natural History Collections*, 209 ZooKeys 133–146 (July 20, 2012) (discussing the benefits of digitization for entomological col-lections, including improved public accessibility and protection of specimens from the risk of de-struction associated with repeated handling), *available at*: https://www.ncbi.nlm.nih.gov/pmc/ar-ticles/PMC3406472/. Physically preparing and digitally recording and cataloging Drake Collec-tion specimens is consistent with, and as near as possible to, Dr. Drake's purpose of making his

collection available for study, and the undersigned therefore recommends granting the United States' request to use Drake Foundation funds for those purposes.  The United States requests permission to use Drake Foundation funds "for the benefit of the Smithsonian's entire Hemiptera-Heteroptera collection, not just the Drake Collection."  ECF No. 1 at 14.  Because, as explained below, the undersigned recommends integrating the Drake Collection with the Smithsonian's broader Hemiptera-Heteroptera collection, the undersigned also recommends granting this request.

However, the undersigned recommends finding that the United States' third proposed use of Drake Foundation funds—"to purchase cabinets, drawers, and other standard entomological museum supplies," ECF No. 1-1 at 3—strays too far from Dr. Drake's intended use of Drake Foundation funds.  Dr. Drake's will transferred the Drake Collection to the Smithsonian and established the Drake Foundation to add specimens to the collection; it did not provide for the use of those funds to pay for storage facilities.  ECF No. 1-1 at 3.  Dr. Drake's will and the 1956 agreement attached as an appendix to it indicate that he expected that the Smithsonian would provide the physical storage facilities for the Drake Collection.  The 1956 agreement by which Dr. Drake physically transferred his collection to the Smithsonian expressly required the Smithsonian to provide, among other things, "space and storage facilities for the collection."  ECF No. 1-2 at 2.  Dr. Drake's expectations in this regard are unsurprising.  It appears common for the Smithsonian to assume the costs of providing storage facilities for donated objects.  *See Gellatly v. Wetmore*, 177 F.2d 73, 74 (D.C. Cir. 1949) (dealing with a similar arrangement wherein a donor transferred his art collection to the Smithsonian, and the Smithsonian "assum[ed] . . . future necessary obligations for the maintenance and care of the collection" and thereafter used appropriated funds for the collection's maintenance); *Smithsonian Inst.*, 2018 WL 3838826, at *1 (involving a gift to the

Smithsonian of 2,300 items, including 19 bronze sculptures, by an agreement that does not appear to have provided any funds for the collection's maintenance or upkeep).

Meanwhile, the United States has offered no evidence to suggest that the Smithsonian would be unable to continue providing for the housing and upkeep of the Drake Collection unless it is permitted to use Drake Foundation funds for that purpose.  *See generally* ECF No. 3 at 23 (explaining that integrating the Drake Collection into the rest of the Smithsonian's Hemiptera-Heteroptera holdings would make more efficient use of storage space, but making no suggestion that this storage is contingent on the availability of Drake Foundation funds); ECF No. 3-2 at 8–9 (same); ECF No. 8-1 at 9–10 (same).

Dr. Drake made his gift to the Smithsonian for the purpose of expanding its Hemiptera-Heteroptera holdings and promoting their study.  Because the United States' other two proposals permit the Smithsonian to use Drake Foundation funds in ways that ultimately promote that purpose, while the third appears only to shift the financial burden of providing storage facilities for the Drake Collection onto the Drake Foundation, the undersigned recommends denying the third proposal.  *See Cerio*, 831 F. Supp. at 541 ("[A]lterations to the trust fashioned to eliminate any impossibility or impracticality of performance, must, as much as possible, result in a trust that effectuates the testator's original purposes"); *cf. Conn. Coll. v. United States*, 276 F.2d 491, 498 (D.C. Cir. 1960) (denying application of *cy pres* "to depart from the settlor's direction merely because it suits [the trustee's] own convenience to do so").

### 2.   Restrictions on the Use of Drake Collection Specimens

The United States also argues that the doctrines of equitable deviation and *cy pres* support permitting the Smithsonian to: (1) integrate the Drake Collection into its larger Hemiptera-Heter-optera collection and (2) loan out the Drake Collection's specimens.  ECF No. 3 at 21–24, 34; ECF

No. 1-1 at 3.  Unlike the United States' request to modify the Drake will's restrictions on the use of the Drake Foundation's income, which more clearly applied to the will's substantive purposes, the request to modify the restrictions on the Smithsonian's keeping of the Drake Collection argu- ably could be considered either an administrative change susceptible to modification under the doctrine of equitable deviation or a substantive change permissible under *cy pres*.  *See* 15 Am. Jur. 2d Charities § 149 ("Equitable deviation can be distinguished from the somewhat similar doctrine of cy pres in that equitable deviation deals only with changes in the administrative provisions of a trust, while cy pres involves an alteration of the purpose to which the res of the trust is to be applied.").  The Court need not resolve whether the proposed changes are administrative or sub- stantive in nature, however, as the doctrines of equitable deviation and *cy pres* both permit a court to modify the terms of a charitable trust where compliance has become impossible, impracticable, wasteful, or unlawful.  *See Wachovia Bank & Trust Co. v. Buchanan*, 346 F. Supp. 665, 669 (D.D.C. 1972) (applying both doctrines to remove unlawful racially discriminatory restrictions from a trust instrument); *see also* D.C. Code § 19-1304.12(b) ("The court may modify the admin- istrative terms of a trust [under equitable deviation] if continuation of the trust on its existing terms would be impracticable or wasteful or impair the trust's administration."); D.C. Code § 19-1304.13 (explaining that the court may apply *cy pres* "if a particular charitable purpose is or becomes un- lawful, impracticable, impossible to achieve, or wasteful").  As explained below, under either doc- trine, the undersigned recommends granting the United States' request to integrate the Hemiptera- Heteroptera collections but not to loan out specimens from the Drake Collection.

> a.      Integrating the Drake Collection

The undersigned recommends finding that modifying the requirement to maintain the Drake Collection separate from the rest of the Smithsonian's Hemiptera-Heteroptera is warranted

because the requirement is wasteful.  Maintaining the Drake Collection separate from the Smith-sonian's other Hemiptera-Heteroptera is inconsistent with modern museum practice, which dic-tates that specimens should be arranged taxonomically rather than by accession source.  ECF No. 3-2 at 7–8.  This is no mere preference.  *Cf. Connecticut Coll.*, 276 F.2d at 498.  Keeping Drake Collection specimens separate "doubles the number of trips to the collections that researchers have to make to retrieve specimens and to record biological data, such as the countries in which a species occurs."  ECF No. 3-2 at 8.  Over time, this has made research into the collection less efficient and has caused "wasted effort" that could have been spent conducting research, rather than dealing with the inefficient logistics caused by separate collections.  *Id.* at 9.  Further, maintaining Drake Collection specimens apart from the rest of the Smithsonian's Hemiptera-Heteroptera collection uses approximately 20–25% more storage space than integrating the collections would, leading to the rapid and premature exhaustion of the Department of Entomology's limited collection space.  *Id.* at 9; ECF No. 8-1 at 9–10.  It has also caused less efficient upkeep of the specimens because "[c]uration of one collection . . . often necessarily neglects curation of the other."  ECF No. 8-1 at 10.  According to the Smithsonian, if the two collections were merged, "it would be much more efficient, and less wasteful, to curate all the Heteroptera holdings, Drake and non-Drake, in a single process."  *Id.*  The undersigned therefore recommends finding that while it may not be impossible or impracticable for the Smithsonian to maintain the Drake Collection separately from the rest of its Hemiptera-Heteroptera collection, the requirement is wasteful.

The United States proposes to integrate the Drake Collection with the rest of the Depart-ment of Entomology's Hemiptera-Heteroptera collection "while continuing to identify Dr. Drake's specimens as coming from the Drake Collection."  ECF No. 1 at 14–15.  The undersigned recom-mends granting this request because it is consistent with, and as near as possible to, Dr. Drake's

original purpose in giving his collection to the Smithsonian.   Integrating the collections would ameliorate the wastefulness of keeping them separate while continuing to preserve the relationship of specimens from the Drake Collection to Dr. Drake, in a more efficient manner that is consistent with contemporary museum practice.  *See Cerio*, 831 F. Supp. at 541.  However, the undersigned also recommends requiring that the Smithsonian label as part of the Drake Collection any future specimens acquired with Drake Foundation funds, consistent with the will's requirement that purchases should be "added to [the Drake] [C]ollection."  ECF No. 1-1 at 4.

b.      Loaning Out Specimens

The undersigned recommends denying the United States' request to permit the Smithsonian to loan out specimens from the Drake Collection because it has not demonstrated that the prohibition against doing so is impossible, impracticable, wasteful, or unlawful, as is required under either *cy pres* or equitable deviation.  *See* 15 Am. Jur. 2d Charities § 149; D.C. Code § 19-1304.12; D.C. Code § 19-1304.13.

The United States has not introduced any evidence demonstrating that the restriction on lending Drake Collection specimens is impossible, impracticable, or wasteful.  Indeed, the Smithsonian's continued compliance with the restriction clearly demonstrates that it is not impracticable. *See Smithsonian Inst.*, 485 F. Supp. at 1238 (finding that Harbor Branch's continuation of Johnson-Sea-Link operations demonstrated that it was not impossible or impracticable for the Smithsonian to continue funding those operations); *see also, e.g., Bd. Of Trs. of Museum of Am. Indian, Heye Found. v. Bd. Of Trs. of Huntington Free Library and Reading Room*, 610 N.Y.S.2d 488, 499 (N.Y. App. Div. 1994) ("Cy pres does not authorize judicial alteration of a charitable disposition simply because there may be some even more efficacious way of achieving the dispositional purposes. . . .  Cy pres is not a means for the comprehensive rearrangement of charitable holdings, but

only of those holdings whose use in accordance with the literal terms of a governing disposition has become 'impracticable or impossible.'").

Instead, the United States argues that a prohibition on lending specimens is contrary to the Smithsonian's policies. *See* ECF No. 3 at 21–22, 34; ECF No. 3-2 at 7–8; ECF No. 8-1 at 10–11. Yet a trustee's institutional policies alone are insufficient to find a restriction has become impracticable. *See Conn. Coll.*, 276 F.2d at 498 (finding a "voluntary change in policy" inadequate to justify applying *cy pres*). The United States also argues that technological developments in insect mailing have made loaning specimens more secure than it was in Dr. Drake's day, and that the restriction is therefore unnecessary. ECF No. 3 at 22–23; ECF No. 3-2 at 7–8; ECF No. 8 at 10. Despite its assurances about modern packaging methods, however, the United States has not demonstrated that the concerns that motivated Dr. Drake to prohibit the Smithsonian from lending Drake Collection specimens have abated. Dr. Drake may have had concerns about breakage during shipping, as the United States and the Smithsonian suggest, but he also might have been concerned about specimens being lost in the mail or not returned. Or he might have been concerned that they could be lost or damaged at research institutions with less scrupulous rules for specimen handling than the Smithsonian. Indeed, it appears from the record that there are still good reasons to be concerned about what might happen to biological specimens that are loaned out. The regulatory changes that have affected insect collecting have also impacted insect lending such that, as one commentator has noted, "museums may be wary of risks of loaning specimens to scientists in developing countries, fearing that their return may not be permitted." Prathapan, 360 Science at 1406, ECF No. 8-3 at 46. For these reasons, the undersigned recommends denying the United States' proposal to permit the Smithsonian to lend out specimens from the Drake Collection.

### III.    CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that the Court **GRANT IN PART** and **DENY IN PART** the United States' motions for modification of a restricted endowment fund and restricted gift and for summary judgment.

\*   \*   \*   \*   \*

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date:  July 31, 2019                                      _____

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE